Mark E. **NETTLES** and Mary Nettles,

v.

**ENSCO MARINE COMPANY.**

Civil Action No. 96–2479.

United States District Court,
E.D. Louisiana.

Sept. 12, 1997.

Fransen & Harden by A. Remy Fransen, Jr., New Orleans, LA, Jacobs, Manuel & Kain by Stanley Joseph Jacobs, David J. Kain, New Orleans, LA, for Mark E. Nettles, Mary Nettles.

Burke & Mayer by William Bryon Schwartz, William Daniel Wellons, New Orleans, LA, for Ensco Marine Co.

Peter B. Tompkins, Gelpi, Sullivan, Carroll & Gibbens, New Orleans, LA, for Amoco Production Co.

FALLON, District Judge.

I heard evidence in the case and I have had an opportunity to review the material and I make the following findings of fact and conclusions of law:

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

(Orally delivered on 9/12/97)

### I.

### PROCEDURAL HISTORY

Mark E. Nettles was employed as an operation specialist by Amoco. On July 2, 1996, he was assigned to work on an offshore platform located on the Outer Continental Shelf off the Coast of Louisiana. After completing his duties for the day he and a fellow employee went to the living quarters on the platform. Mark E. Nettles proceeded to take a shower. While so engaged the M/V ENSCO ENDEAVOR, it is alleged that an offshore supply vessel owned and operated by Ensco Marine Company, came in contact

with the boat deck of the platform. Mark E. Nettles fell and sustained injuries. Mark E. Nettles and his wife have filed suit alleging that the incident and resulting damages were caused by the negligence of Ensco Marine. Ensco Marine denies that it was negligent and claims that if its vessel did in fact come in contact with the boat deck that it was a normal bump to be expected and that they were in no way the cause of the plaintiffs injuries. This cause came on for a non jury trial which commenced on September 8th, 1997, and concluded on September 11th, 1997.

The Court having carefully considered the testimony of all of the witnesses, the exhibits entered at trial, the record, and pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, hereby orally enters the following findings of fact and conclusions of law.

To the extent that any findings of fact constitute a conclusion of law, the Court hereby adopts it as such, and to the extent that any conclusions of law constitute a finding of fact, the Court hereby adopts it as such.

## II.

### FINDINGS OF FACT

(1)

At approximately 2:00 o'clock P.M. on July 2nd of 1996, Mark Nettles along with Tony McElroy, an employee of Danos & Curole, were sent to Amoco stationary offshore platform West Delta 75F, which was located on the Outer Continental Shelf approximately thirty miles off the coast of Grand Isle, Louisiana, for the purpose of insuring that a piece of equipment, namely, a separator worked properly when a well was brought in.

(2)

This offshore structure rests on four legs which are seated on the sea bed of the Gulf of Mexico. At the waterline there is a boat deck which is an L-shaped platform approximately 45 feet by 45 feet. Above the boat landing is a subdeck about the same size. And some 65 to 70 feet above the waterline is the main deck, which is larger. On the main deck there is a dog house or living quarters.

(3)

Nettles and McElroy were the only individuals on the platform at this time.

(4)

When the day's work was completed Nettles and McElroy returned to the living quarters on the platform where they intended to spend the night.

(5)

At approximately 6:10 P.M. Nettles was taking a shower when the offshore utility vessel ENSCO ENDEAVOR came in the vicinity of the platform.

(6)

The M/V ENSCO ENDEAVOR is a vessel owned and operated by Ensco Marine Company, which is a Delaware corporation with its operations office maintained in Broussard, Louisiana.

The ENSCO ENDEAVOR is a documented and inspected vessel, documented and inspected by the United States Coast Guard, with a measured length of a 137.3 feet, overall length of 146 feet a breath of 26 feet and depth of 10.5 feet. The vessel is an offshore supply vessel providing transportation services for men, equipment and supplies to various oil company platforms in the Gulf of Mexico.

(7)

The captain of the vessel Tony Donaldson planned to stop at the platform to let one of the passengers, an Amoco employee named Johnny Green, board the platform to retrieve some electrical cord and wiring so it could be used on another Amoco platform in the same offshore field.

(8)

While maneuvering toward the platform a portion of the stern of the ENSCO ENDEAVOR came in contact with the boat landing of the platform causing the platform to shake.

(9)

The unexpected movement of the platform caused Nettles to fall in the shower stall. He struck his lower back and knocked a cap off one of his teeth.

(10)

Nettles shouted from the bathroom that he had been knocked down and was hurt and asked McElroy to go see what had happened.

(11)

Following that request McElroy left the living quarters and looked over the side of the platform and saw the ENSCO ENDEAVOR pulling away from the boat dock.

(12)

At the time of the incident McElroy was in the bunk room leaning on the top of the a bunk, apparently doing some paperwork. He said the blow caused him to "rock back and forth." In describing the nature of the impact he testified that he had never been on a platform that had been hit that hard before the incident.

Bryan Broussard, an employee of Fowley Crane Construction Company, a subcontractor of Amoco, was on the ENSCO ENDEAVOR at the time of the impact. He described the force of the impact as "major" compared to the other bumps he experienced during his seventeen years working offshore.

Johnny Green, the Amoco employee, who was planning to board the platform was standing on the stern of the vessel as the vessel approached the platform. He saw the port stern of the vessel collide with the boat landing. Based on his sixteen years experience offshore he testified that the vessel came in too fast and struck the platform a lot harder than usual.

James Weber, a drilling superintendent for Amoco, was a passenger on the back deck of the vessel. He was watching as the port stern began to approach the platform and eventually came in contact with the boat landing. Although he described the blow as a normal bump, the Court takes note of the fact that he had fore knowledge of the impact and readied himself for it. Not withstanding his preparation, however, the impact caused even him to lurch forward.

There were several witnesses who denied ever seeing or feeling any impact. The Court finds these witnesses were not credible, either because they were completely impeached, as for example, Sean Hester, or because they had a personal interest in the docking operation as in the case of the captain Tony Donaldson, or because they were located off the deck in the galley or lounge of the vessel.

(13)

The credible evidence supports the conclusion that the ENSCO ENDEAVOR forcefully came in contact with the platform and that the impact caused the platform to shake

(14)

Shortly after the incident Nettles radioed Robert Anthony Griffin, an Amoco employee who was serving as a field relief foreman and told him that he, Nettles, was injured when the ENSCO ENDEAVOR hit the platform causing him to fall in the shower. The next morning, because of severe pain in his back and after a hard night twisting and turning, Nettles reported that he needed to come in and was flown to shore for medical treatment. He was seen by a doctor in Houma, Louisiana and then returned to his home in Brookhaven, Mississippi where he resides with his wife, Mary Nettles.

(15)

Nettles saw his family physician, Dr. Baxter Irby in Brookhaven on July 5th, 1996. Dr. Irby's examination revealed that Nettles had pain in the buttocks and his foot was numb and he had pain in his leg. He was referred to Dr. Lynn Stringer, a neurosurgeon, in Jackson, Mississippi

(16)

Nettles had a prior herniated disc at L5–S1 which was removed by Dr. Stringer in June of 1995.

(17)

After the June 1995, surgery Nettles was cleared to return to work offshore, and on September the 1st of 1995 he did in fact return and was able to perform his job without any pain or physical problems until the incident of July 2nd, 1996.

(18)

When Nettles saw Dr. Stringer following the July 2nd, 1996 incident, he had pain in his back and radiating pain in the leg. Based on the examination and diagnostic

tests Dr. Stringer concluded that Nettles had a recurrent herniation at the L5–S1 level of his spine.

(19)

The medical evidence, namely, the testimony of Dr. Stringer and Dr. George Carey, Nettles' current treating physician, supports the conclusion that the incident in the shower on July 2nd, 1996 was the cause of the recurrent herniated disc.

(20)

Dr. Stringer performed a micro lumbar discectomy at L5–S1 level of Nettles' spine on July 25th of 1996.

(21)

At the time of the trial Nettles is still having considerable pain and has limitations on standing for long periods of time, climbing, stooping, bending, lifting and sitting. He is a candidate for a rehabilitation regime, and in time a work hardening program.

(22)

The credible medical evidence indicates that his prognosis is good for his return to some type of work, but it is not· good for his return to offshore work. He will not be able to return to offshore work. He will have permanent restrictions on bending, stooping, climbing and lifting weights in access of twenty-five pounds and sitting for long periods.

(23)

The good news, if there is any good news in this unfortunate situation, is that Nettles has a good education and is proficient with electronic equipment. He is a hard worker and has demonstrated that throughout his life. He completed high school in 1971, and then attended a two year program in electronics at Copiah Lincoln Junior College graduating with an Associates of Arts Degree with honors in electronics in 1973.

From 1973 through 1979 Nettles was a service technician with Lanier Business Machines providing repair and maintenance services on office equipment. Thereafter, for about one year, Nettles and another individual operated a business of servicing office equipment and utilized his learned skills in the electronics field. He also repaired and serviced T.V.'s and audio equipment. In short he has the education and experience and the work ethic which will allow him to compete for jobs which do not stress strength or agility.

(24)

In addition to his back injury, Nettles suffers from chronic depression and personality adjustment disorders. These conditions predated his injury of July 2nd. They were not caused by his back injury. Nevertheless, his back injury did have some aggravating effect on his chronic depression. But any effect of his injury on his chronic depression is likely to abate when he returns to some gainful activity.

III.

### CONCLUSIONS OF LAW

(1)

The Court has jurisdiction over this matter pursuant to:

1. 28 U.S.C. 1333, which provides original jurisdiction over admiralty and maritime claims;

2. 33 U.S.C. Section 905(b), which authorizes a covered employee to bring a claim against a vessel;

3. 46 U.S.C. App. Section 740 entitled the extension of Admiralty Act, which extends General Maritime Law to land or extensions of land, such as this platform, when an incident occurs over navigable waters but is consummated on land or the extension of land, and

4. 43 U.S.C. 1333 known as the Outer Continental Shelf Lands Act.

The General Maritime Law is the substantiative law applicable to this case. *See 46 U.S.C. App. Section 740*, and *Continental Oil Co. v. London Steam–Ship Owners' Mutual Insurance Association*, 417 F.2d 1030 (5th Cir.1969).

(2)

As mentioned the incident giving rise to the present lawsuit occurred when a vessel collided or allided with a fixed platform located on the Outer Continental Shelf

### (3)

■ Liability for collisions or allisions is based upon a finding of fault that the collision caused or contributed to the damage. From the earliest times this rule has been consistently applied. *See Owen. The Origins and Development of Maritime Law* 51 Tulane Law Review 759, 1997.

### (4)

■ The test and standards for a finding of fault or negligence is reasonable care under the circumstances. *Schoenbaum Admiralty and Maritime Law,* Volume 2 page 255 Second Edition 1994.

### (5)

■ In the present case it is the conclusion of the Court after hearing the testimony and observing the demeanor of the witnesses, that the cause of Mark E. Mark Nettles injuries was the negligence of the defendants employee the captain of the ENSCO ENDEAVOR in causing or allowing his vessel to forcefully strike the Offshore Platform West Delta 75F.

### (6)

Mark E. Nettles was born on July 25th, 1953. He was forty-two years old at the time of his injury. He had a worklife expectancy of seventeen years and a life expectancy of thirty-three years. He had been employed by Amoco for sixteen years, and at the time of his injury his wage after taxes, of all kinds, was approximately $45,000.00 per year plus $9,000.00 in fringe benefits. As a result of the above-described incident and resulting injuries he sustained the following loss of wage earning capacity:

#### a. *Past loss.*

The Court finds that the evidence justifies the conclusion that Nettles has been and will be temporarily totally disabled from 7/2/96 to 7/2/98. A period of two years. During this time he either has loss or will lose wages and fringe benefits in the amount of $108,000.00.

#### b. *Future loss.*

### (1)

The Court finds the evidence and law supports the conclusions that Nettles will be able to return to some gainful activity, and from 7/2//98 to 7/2/01, a period of some three years, he will be able to earn approximately $10,700.00 per year so that he will sustain a loss of $34,300.00 annually.

The Court concludes he will not have any loss of fringe benefits because he will be able to receive some fringe benefits and eventually the same fringe benefits in his future employment as he had in the past. Reducing this amount to present value using an appropriate below market discount rate would result in a loss of $99,000.00.

### (2)

The Court further finds that the evidence and law supports the conclusion that from 7/2/01 to 7/2/06 he will be able to average approximately $23,000.00 per year, so that he will have an annual loss of 22,000 per annum. Again reducing this figure to present value using an appropriate below market discount rate would produce a loss of $103,697.00

### (3)

The Court further finds that the evidence and law supports the conclusion that Nettles, through his industry and his efforts and his work ethic, will continue to improve his efficiency and enhance his wage earning capacity. He has demonstrated that in the past. He has demonstrated proficiency. He has demonstrated a capacity for hard work, and he has demonstrated a willingness to work. From 7/2/06 to 7/2/13, the end of his worklife expectancy he will average $30,000.00 per year and will thus have a loss of wage earning capacity of 15,000 per year. Reducing this figure by the appropriate below market discount rate, the result will be a loss of $97,000.00.

In summary, the past and future wage earning lost of Mark E. Nettles is $407,697.00. See *Norfolk & W. Ry. Co. v. Liepelt,* 444 U.S. 490, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980); *Jones & Laughlin Steel Corp. v. Pfeifer,* 462 U.S. 523, 103 S.Ct. 2541, 76 L.Ed.2d 768 (1983) processed 1983. *Culver*

*v. Slater Boat Co.,* 722 Fd.2d 114 (5th Cir. 1983).

(7)

In addition to the loss of wage earning capacity Nettles incurred medical expenses made necessary by his injuries. He is entitled to recover the amount of these losses which total $11,266.19

(8)

■ Mark E. Nettles also sustained and will sustain for an indefinite time in the future, in all likelihood the rest of his life, mental and physical pain and suffering. Hopefully this will reduce itself in time. But from the evidence presented the Court concludes that an appropriate amount for this element of damage is $150,000.00. 80,000 of which is attributable to the time prior to the trial and 70,000 is allotted for the future.

(9)

■ Mary Nettles, Mark E. Nettles' wife, has filed a claim for loss of consortium. As mentioned, the General Maritime Law is applicable to the present case. See 46 U.S.C. App. 740. Also see *Continental Oil Co. v. London Steam–Ship Owners' Mut. Ins. Ass'n,* 417 F.2d 1030 (5th Cir.1969).

Under the General Maritime Law there is no claim for loss of consortium on the Outer Continental Shelf. See *Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978). *Nichols v. Petroleum Helicopters,* 995 F.2d 82 (5th Cir.1993), and *Miles v. Apex Marine Corp.,* 498 U.S. 19, 111 S.Ct. 317, 112 L.Ed.2d 275 (1990).

(10)

■ This is an admiralty case tried without a jury pursuant to the Court's admiralty jurisdiction invoked by Federal Rule of Civil Procedure 9(h). Accordingly, an award of prejudgment interest on past damages is proper. And the starting date and rate is left to the sound discretion of the Court. See *Doucet v. Wheless Drilling Co.,* 467 F.2d 336 (5th Cir.1972). *Marathon Pipe Line Co. v. M/V Sea Level II,* 806 F.2d 585 (5th Cir. 1986).

The Court finds that an award of prejudgment interest from the date of judicial de-

mand is appropriate in this case at the rate of 5.67% per annum on plaintiff's past damages as described above. *Martin v. Walk, Haydel & Associates, Inc.* 794 F. 2d 209, 212 (5th Cir.1986).

(11)

Since his injuries Nettles has received compensation benefits paid by his employer Amoco. The total compensation paid to Nettles to date is $50,076.16. This amount has been stipulated by the parties.

The total medical payments paid on behalf of Nettles, which is included in that figure, is $10,043.19. I'm sorry, it's not included in that figure. The total comp is 50,076.16 and total medical is 10,043.19.

His employer is entitled to reimbursement of these sums from any amounts recovered. *See Bloomer v. Liberty Mutual Ins. Co.,* 445 U.S. 74, 100 S.Ct. 925, 63 L.Ed.2d 215 (1980).

IV.

*SUMMARY*

On the basis of the foregoing findings of fact and conclusions of law, the Court finds that the plaintiff Mark E. Nettles has sustained damages due to the defendant's negligence. Accordingly the plaintiff is entitled to recover from the defendant Ensco Marine Company the following damages: $108,000.00 for past earnings lost; $299,697.00 for future earnings lost; $11,266.19 for past medical expenses; and $150,000.00 for past, present and future pain and suffering.

Additionally, the plaintiff is entitled to prejudgment interest on the above past losses totalling $199,266.19 at the rate of 5.67% per annum from the date of judicial demand until the judgment is satisfied. Further, the plaintiff is entitled to post judgment interest at the legal rate on the above itemized future losses totaling $369,697.00 from the date of judgment until satisfied.

Finally, the compensation and medical lien asserted and stipulated by and between the parties is recognized. *Bloomer v. Liberty Mut. Ins. Co.,* 445 U.S. 74, 100 S.Ct. 925, 63 L.Ed.2d 215. That is the judgment of the Court.

Thank you, gentlemen, for the professional manner in which all of you have tried this case.

Court will stand in recess.

MR. FRANSEN: Judge, may I make a observation?

THE COURT: Yes.

MR. FRANSEN: Your Honor, there's something I but this there is something I noted and I may have not heard right.

THE COURT: Okay.

MR. FRANSEN: When you were talking about the numbers I know that the final number of 369,000 included all of the future items, but I think that, unless I misheard, you may have not mentioned that entire amount when you were going from 7/2/98 to 7/2/01, 7/2/01 to 7/2/06, 7/2/06 to 7/2/13. think you may have overlooked the period 7/2/06 to 7/2/13. That was my impression. I don't know if anybody heard it but I was writing. I just to want to be sure that if it's deleted accidently the judgment will be as you said earlier.

THE COURT: I think I covered it.

MR. FRANSEN: Okay.

THE COURT: Fine.

MR. FRANSEN: And on behalf of my clients thank you very much for your time.

THE COURT: I ask the parties to get together and confect a judgment and submit it to the Court for my review within ten days of receipt of the transcript of my findings.

Thank you, gentlemen.

Court will stand in recess.

MR. FRANSEN: Thank you.

THE CLERK: Everyone rise.

Court stands in recess.