IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 97-30982
Summary Calendar

_____


MICHAEL TODD THERIOT; MELISSA D. THERIOT;
JEFFREY L. DAVIS; KELLY F. DAVIS,

                                        Plaintiffs-Appellees,
                                        Cross-Appellants,

                        versus

UNITED STATES OF AMERICA, ET AL.,

                                        Defendants,

HERBERT M. HAMILTON, JR.,

                                        Defendant-Appellant,
                                        Cross-Appellee,

STATE FARM FIRE AND CASUALTY COMPANY,

                                        Defendant-Cross-Claimant,
                                        Appellant-Cross-Appellee,

                        versus

UNITED STATES OF AMERICA, on behalf of
United States Army Corps of Engineers,

                                        Defendant-Cross Defendant-
                                        Appellee.

_____

DAVID M. ESTES; HERBERT M. HAMILTON, JR.,

Plaintiffs-Appellants,

versus

UNITED STATES OF AMERICA, on behalf of
United States Army Corps Engineers,

Defendant-Appellee.

───────────────────────────────────────

Appeals from the United States District Court for
the Western District of Louisiana

───────────────────────────────────────
December 1, 1998

Before REAVLEY, BENAVIDES and PARKER, Circuit Judges.

PER CURIAM:

This consolidated admiralty case arises from the allision of a recreational fishing craft and

an underwater sill or weir constructed by the United States Army Corps of Engineers, which

occurred on October 8, 1994. Passengers Michael Theriot, Jeffrey Davis and their spouses

brought negligence claims under the Suits in Admiralty Act against the United States, Herbert

Hamilton, Jr., the operator of the vessel, and State Farm Fire and Casualty Company ("State

Farm"), Hamilton's liability insurer. David M. Estes, the vessel owner, and Hamilton sought

recovery for their injuries from the United States.[*] State Farm filed a cross-claim against the

United States to recover sums paid to David Estes for the total loss of his Boston Whaler.

After a bench trial, the district court entered judgment in favor of the United States

───────────────────────

[*] The State of Louisiana was also a named defendant in both cases, but all plaintiffs
voluntarily dismissed their claims against the state prior to trial.

2

holding that, although the United States was negligent in failing to place a warning sign at the location of the underwater sill, it was immune from liability because its decision not to physically mark the location was within the discretionary function exception to the Suits in Admiralty Act. The district court also entered judgment against defendants Hamilton and State Farm finding that Hamilton had negligently operated the boat. On appeal, Hamilton and State Farm claim that the district court applied an incorrect standard of care in finding that Hamilton was negligent. Appellants also assert that the district court erred in concluding that the government was immune from liability because the government's actions were not within the discretionary function exception. We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

The allision occurred on October 8, 1994, while David Estes, Herbie Hamilton, Jr., Michael Theriot and Jeffrey Davis were fishing in Estes's 24' Boston Whaler in the second cut north of Port Eads Marina at approximately mile 10.1 Below Head of Passes on the West Bank of the South Pass of the Mississippi River. Located approximately 75 feet inside the mouth of the cut is a water control structure or sill, which was built by the Army Corps of Engineers ("Corps") in 1959. When originally constructed, the sill was tied into the banks of the outlet by earthen levees that were visible above the water. The middle portion of the structure, the sill itself, has always been submerged at all but the lowest water levels. Since approximately 1976, due to the erosion of the earthen levees, the sill has been entirely submerged, but continues to perform its function of preventing silt build-up by increasing the water velocity in the South Pass channel. On the day of the accident, the usual noticeable rolling or break in the water indicating the sill's position was not present. The location of the sill is charted on the authorized navigational chart

3

for the area published by the National Oceanic and Atmospheric Administration ("NOAA chart 11361"), but there has never been a warning sign or physical marker at the site. The existence of sills in that area is also noted in two of the Coast Guard's Notice to Mariners issued in 1994, which were available to the public.

After Estes successfully piloted the boat through the cut, plaintiffs drifted the cut twice in search of redfish then decided to fish somewhere else. Hamilton then took the helm and instead of exiting through the same area of the cut as Estes had entered, he steered the vessel closer to the northern bank. Preparing to enter the Gulf of Mexico, Hamilton accelerated to approximately 15 miles per hour when he struck the submerged sill. The vessel came to an abrupt stop throwing Theriot and Estes out of the boat and causing Hamilton and Davis to strike objects within the boat, each sustaining various injuries. Estes was able to stand on the submerged sill and the water came up to about his knees. No one in the group had ever operated a boat in the South Pass, nor was anyone familiar with the area. No one had consulted an authorized navigational chart of the area prior to or during their trip. The two charts the group did consult, a chart of the Gulf of Mexico and a more particular chart of the South Pass, did not depict the hazards or depths of this area of the South Pass.

The Corps and the Coast Guard have an internal Memorandum of Agreement ("MOA") concerning marking and removal of sunken vessels and other obstructions to navigation. The district court found that this agreement applies only to privately owned vessels or structures and not to structures owned or constructed by the United States. According to the district court, the MOA is not a mandatory rule or regulation that prescribes a fixed course of conduct. The MOA lists specific factors that are to be considered to determine if an obstruction is a hazard to

navigation and to determine the appropriate course of action to increase safety to an acceptable level. Although the MOA does not apply specifically to government owned structures, the same factors are considered in determining how to notify the public of a government owned obstruction or hazard to navigation, and whether or not a physical marker or warning sign is appropriate.

Prior to this incident, several accidents involving the area of the sill in question had been reported to the Corps. After one such incident, the Coast Guard made a preliminary recommendation to place signs in the South Pass channel. After further investigation and coordination with the Coast Guard, the Corps decided that charting the location of the sill on NOAA chart 11361 and warning seafarers of the danger through the Notice to Mariners was sufficient.

After a bench trial, the district court found the actions of both the United States and Hamilton to be negligent, apportioning 80% of the fault to the United States and 20% to Hamilton. Specifically, the district court found that the United States was negligent in failing to place a warning sign at the location of the underwater sill, but that the United States was immune from liability because the decision to warn mariners by navigational charts and notices to mariners rather than by physically marking the site was within the discretionary function exception to the Suits in Admiralty Act. The district court also found that Hamilton negligently operated the boat because despite his admitted unfamiliarity with the area, he failed to consult the authorized navigational charts to determine the depths and hazards of the surrounding waters and operated the vessel at an unsafe speed under the circumstances. As a result of the government's immunity, the district court found Hamilton and his insurer State Farm 100% liable *in solido* for the allowed damages. The stipulated damages of Estes and Hamilton were disallowed as they had sued only

the United States.

## II. DISCUSSION

A.    *Standard of Review*

In an admiralty action tried by the court without a jury, the factual findings of the district court are binding unless clearly erroneous. *See Coumou v. United States*, 107 F.3d 290, 295 (5th Cir.), *modified*, 114 F.3d 64 (1997). Questions of law are reviewed de novo. *See id.* We review findings of mixed law and fact by assessing the trial court's underlying factual findings and factual inferences deduced therefrom under the clearly erroneous standard and by evaluating any legal conclusion based on this factual data as an issue of law. *See Michel v. Total Transp., Inc.*, 957 F.2d 186, 189 (5th Cir. 1992). Contract interpretation is a question of law, subject to de novo review. *See Dow Chem. Co. v. M/V Roberta Tabor*, 815 F.2d 1037, 1042 (5th Cir. 1987). "The district court's rulings on negligence, cause, and proximate cause are findings of fact, while its determination of the existence of a legal duty is a question of law." *Coumou*, 107 F.3d at 295 (internal quotation marks omitted). However, if the district court's finding of negligence was based on an incorrect legal principle, the clearly erroneous test does not apply and we will disregard such findings. *See Dow Chem. Co.*, 815 F.2d at 1042.

"A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S. Ct. 525, 542, 92 L. Ed. 746 (1948); *see Johnson v. Gambrinus Co./Spoetzl Brewery*, 116 F.3d 1052, 1056 (5th Cir. 1997). "When, as here, the district court is faced with testimony that may lead to more than one conclusion, its factual determinations will stand so long as they are plausible—even

6

if we would have weighed the evidence otherwise." *Schlesinger v. Herzog*, 2 F.3d 135, 139 (5th Cir. 1993) (internal quotation marks omitted). "Where the court's finding is based on its decision to credit the testimony of one witness over that of another, 'that finding, if not internally inconsistent, can virtually never be clear error.'" *Id.* (quoting *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 575, 105 S. Ct. 1504, 1512, 84 L. Ed. 2d 518 (1985)).

B.    *Discretionary Function Exception*

Appellants challenge the district court's conclusion that the United States negligent conduct fell within the discretionary function exception to the Suits in Admiralty Act on two principal grounds. First, appellants argue that the United States negligently failed to maintain the sill in its original condition—so that the earthen levees tying the structure into the bank are visible above the water—and that this conduct is not a discretionary function. Second, appellants argue that the government's failure to mark the sill's location with a warning sign was not within the discretionary function exception because, contrary to the district court's finding, the government acted in violation of the MOA, which constitutes a non-discretionary, mandatory rule or regulation. We address each argument in turn.

1.    *Failure to Maintain the Sill in its Original Condition*

We must point out that the district court's finding of negligence on the part of the United States was not based on its failure to maintain the sill in its original condition. Rather, the district court's negligence finding was based on the failure to place a physical marker or warning sign near the underwater sill. The district court expressly rejected appellants' negligence theory based on failure to maintain the sill in its original condition so that the edges remained above the waterline. The district court found that the sill's design was purely functional and was not

7

intended to warn boaters of the sill's existence. Further, the district court found that the sill continued to perform its function in its current completely submerged condition. Because we conclude that the district court's negligence finding based on the failure to place a warning sign at the sill's location was not clearly erroneous, appellants' argument that the failure to maintain the sill was not within the discretionary function exception is irrelevant.

Throughout the proceeding appellants asserted that the United States was negligent for failing to maintain the sill in its original condition. Indeed, the district court found that as originally designed the sill extended across the entire width of the cut and the edges of the structure extended approximately four to five feet above the waterline, but that the sill had been completely submerged at all but the lowest water levels since approximately 1976. This is supported by the testimony of Emile Shilling, the operations project manager for the Corps with authority over this area of the Mississippi River. Shilling also testified that despite the erosion of the levees and the fact that the sill no longer extends across the entire cut, the structure still serves its purpose to reduce silt build-up in the South Pass, thereby reducing the need for maintenance dredging. Based on this evidence, the district court rejected the argument that the United States was negligent for failing to maintain the sill in its original condition as the sill's design was never intended to serve as a warning for boaters.

On this record, we are not "left with the definite and firm conviction that a mistake has been committed." *United States Gypsum Co.*, 333 U.S. at 395, 68 S. Ct. at 542. Moreover, the cases cited by appellants to support their failure to maintain argument are inapposite. These cases concern the government's failure to maintain various navigational aids, such as buoys and lighthouses. The government's decision to provide the service, *i.e.,* to place a buoy or erect a

8

lighthouse, was held to be a discretionary decision, but the government's failure to maintain the structure was not within the discretionary function exception. *See, e.g.*, *Indian Towing Co. v. United States*, 350 U.S. 61, 69-70, 76 S. Ct. 122, 126-27, 100 L. Ed. 48 (1955) (holding that decision to operate lighthouse is discretionary decision, while failure to maintain lighthouse is not within discretionary function exception); *Denham v. United States*, 834 F.2d 518, 520-21 (5th Cir. 1987) (holding that decision to establish recreational swimming area was discretionary, but failure to replace buoy secured by an anchor that injured a swimmer was not within discretionary function exception); *Sheridan Transp. Co. v. United States*, 834 F.2d 467, 473 (5th Cir. 1987) (recognizing that initial decision to place buoy 60' from wreck was a protected discretionary function, but moving the buoy another 250' away from the wreck without notifying the public was a negligent act not within the discretionary function exception), *appeal after remand*, 897 F.2d 795 (5th Cir. 1990); *Drake Towing Co. v. United States*, 765 F.2d 1060, 1064 (11th Cir. 1985) (stating that "the initial decision to place aids to navigation such as the temporary buoys in this case is within the Coast Guard's discretion"). The crucial distinction in the present case is that the sill was not constructed to be an aid to navigation. As the district court found, its design was not intended to warn boaters. It was not necessary for the sill to remain above water to serve its purpose of increasing the flow in the channel to reduce the need for maintenance dredging. Had the United States made a decision to physically mark the location of the sill, and then negligently executed that decision causing appellants' injuries, then these authorities would be relevant. However, those are not the facts here.

2.      *Failure to Place a Marker or Warning Sign Near the Location of the Sill*

We also reject any claim that the United States failure to place a warning sign near the

vicinity of the sill was not within the discretionary function exception. Whether the government's conduct falls within the discretionary function exception is a question of law, which we review de novo, applying the undisputed facts of the case. *See Buchanan v. United States*, 915 F.2d 969, 970 (5th Cir. 1990); *Aragon v. United States*, 146 F.3d 819, 823 (10th Cir. 1998).

The Suits in Admiralty Act ("SAA"), 46 U.S.C.A. §§ 741-752 (1975), serves as a waiver of sovereign immunity and authorizes suits against the government in admiralty cases where such claims could be brought against a private party. But, the SAA does not waive immunity for discretionary acts of government agencies that fall within the discretionary function exception set forth in the Federal Tort Claims Act. *See* 28 U.S.C.A. § 2680(a) (1994); *Baldassaro v. United States*, 64 F.3d 206, 208 (5th Cir. 1995) (holding that discretionary function exceptions applies to the SAA), *cert. denied*, 517 U.S. 1207, 116 S. Ct. 1823, 134 L. Ed. 2d 48 (1996); *Wiggins v. United States*, 799 F.2d 962, 966 (5th Cir. 1986). Under this exception, the government is not liable for "[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

The Supreme Court has articulated a two part test to determine whether the challenged conduct falls within the discretionary function exception. First, the conduct must be discretionary in nature, that is it must "involv[e] an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322, 111 S. Ct. 1267, 1273, 113 L. Ed. 2d 335 (1991) (citations omitted). "This requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *Id.* (quoting *Berkovitz v. United States*, 486

10

U.S. 531, 536, 108 S. Ct. 1954, 1958-59, 100 L. Ed. 2d 531 (1988)). Second, the judgment or decision must be grounded on considerations of social, economic, or political public policy. *Id.* at 323-24, 111 S. Ct. at 1273-74.

> a. *Discretionary Conduct*

The United States is under no statutory duty to establish an aid to navigation at a particular place. *See Tringali Bros. v. United States*, 630 F.2d 1089, 1090 (5th Cir. Unit A 1980) (holding that the Coast Guard has no statutory duty to place navigational aids in hazardous waterways but is authorized to do so). Although, the Coast Guard has the specific authority to mark obstructions to navigation pursuant to 14 U.S.C. § 86, it is not required to do so. *See* 14 U.S.C.A. § 86 (West 1990). Appellants argue that section 5(b)(4) of the Memorandum of Agreement ("MOA") mandates the placement of a marker at the location of the sill at issue here and that failure to do so is not protected by the discretionary function exception. The district court found that the MOA did not apply to objects owned or constructed by the United States, and even so, it did not constitute a mandatory rule requiring on-site marking of the sill. We agree with the conclusion of the district court.

According to its terms, the MOA "provides procedures on coordination to determine whether an obstruction is a hazard to navigation and procedures to determine the appropriate corrective actions to be taken by" the Corps and the Coast Guard. An obstruction is defined as "[a]nything that restricts, endangers, or interferes with navigation." A hazard to navigation is defined as "[a]n obstruction, usually sunken, that presents sufficient danger to navigation so as to require expeditious, affirmative action such as marking, removal, or redefinition of a designated waterway to provide for navigational safety." When the Corps or Coast Guard receives a report

11

of a sunken vessel or other obstruction, section 5 lists the required actions, including: (a) assessing the obstruction's impact upon navigation; (b) deciding "if an obstruction is a hazard to navigation [and] agree[ing] upon appropriate corrective action(s) to reduce the danger to navigation to an acceptable level;" and (c) disseminating navigational safety information pertaining to obstructions.

Section 7 of the MOA, entitled "Decision-making Guidance" sets forth the corrective action options and the factors relevant to deciding whether an obstruction is a hazard to navigation and if so, the appropriate course of action. The alternative corrective actions include: (1) "No action;" (2) "Charting;" (3) "Broadcasting and publication of navigational safety information;" (4) "Marking;" (5) "Redefinition of navigational area;" (6) "Removal;" and (7) "Combination of the above." Section 7(b) lists several non-exclusive factors relevant to deciding if an obstruction is a hazard to navigation and if so, the appropriate action that should be taken. These factors include:

> (1) The degree to which the obstruction restricts, endangers, or interferes with the navigability of a body of water.
> (a) Location with respect to navigational traffic patterns.
> (b) Navigational difficulty at the site of the obstruction.
> (c) Clearance or depth of water over obstruction.
> (d) Fluctuation of water level and other hydraulic characteristics.
> (2) Physical characteristics of the obstruction, including cargo (if any exists).
> (3) Possible movement of the obstruction.
> (4) Marine activity in the vicinity of the obstruction.
> (a) Type of commercial and recreational vessel traffic.
> (b) Density of commercial and recreational vessel traffic.
> (c) Trends of waterway use.
> (5) Location of obstruction with respect to existing aids to navigation.
> (6) Prevailing and historical weather conditions.
> (7) Length of time the obstruction has been in existence.
> (8) History of vessel accidents involving the obstruction.

The thrust of appellants' claim of error is that section 5(b)(4), which requires an owner to immediately mark a hazard to navigation, applies to the United States and is a mandatory rule or policy that prescribes a fixed course of conduct, requiring no element of judgment or choice. Thus, the failure to adhere to this provision is not protected by the discretionary function exception. *See Berkovitz,* 486 U.S. at 536, 108 S. Ct. at 1958. Section 5(b)(4) provides:

> Marking Issues. In every case where an obstruction is declared to be a hazard to navigation, the location will be marked immediately by the owner. In the event that the owner cannot be identified, refuses to mark the obstruction, inadequately marks the obstruction, or is otherwise unable to properly mark it, the Coast Guard has authority under 14 U.S.C. [§] 86 to take appropriate action.

Appellants focus on the phrase "in every case" and the absence of any express language that the MOA does not apply to government owned structures to support their assertion that this is a mandatory non-discretionary requirement applicable to the United States. On the other hand, we note that the MOA also does not expressly state that it does apply to government owned structures. Shilling testified that the MOA only applied to privately owned structures, but that the Corps and the Coast Guard considered the same factors listed in the MOA to determine the appropriate course of action with respect to government owned obstructions or hazards to navigation. Appellants presented no contradictory evidence to support their position other than the agreement itself.

We agree with the interpretation adopted by the district court and supported by Shilling's testimony that the MOA and specifically section 5(b)(4) applies only to privately owned structures. This interpretation is consistent with an overall reading of the document. Numerous references to the "owner" of an obstruction or sunken vessel are made throughout the agreement. In each case, the logical reading is that the referenced owner is a private third party other than the

13

Corps, the Coast Guard, or any other government agency. For example, section 5(b)(4) refers to the Coast Guard's authority under 14 U.S.C. § 86 to mark the obstruction if the owner cannot be identified or fails to adequately mark the hazard. Section 86 not only gives the Coast Guard authority to mark obstructions, but also makes the owner liable to the United States for the costs of marking the hazard. *See* 14 U.S.C. § 86. When both provisions are read in context, it does not make sense for the term "owner" to also refer to the United States. The issues of identification of the owner, refusal to mark, inability to mark, or inadequate marking mentioned in section 5(b)(4) are only pertinent to private owners. Additionally, Shilling's testimony that this provision is directed primarily at sunken vessels or other privately owned obstructions that are not shown on the authorized navigational charts supports the conclusion that this provision applies only to private owners.

Moreover, even if the MOA is interpreted to apply to government owned structures as well, notwithstanding section 5(b)(4), marking the location of a hazard to navigation is not a mandatory corrective action. As discussed above, section 7(a) lists the alternative options once the Corps and Coast Guard decide that an object is a hazard to navigation. Marking is only one of the options and is not mandated. Thus, we conclude that MOA does not apply to government owned structures or hazards, nor is physically marking the location of a hazard to navigation a mandatory requirement. That being the case, the decision of whether or not to physically mark the sill's location clearly involved an element of judgment or choice. As Shilling testified, the Corps considers the same options and factors outlined in the MOA to determine the appropriate course of action for notifying the public of the existence of a hazard to navigation. Marking is only one of the available options. Other options include charting, removal, dissemination of

14

navigational safety information, redefinition of the navigational waterway, no action, or any combination. The Corps must clearly use its judgment to choose among the available alternatives and determine the appropriate course of action.

b.    *Public Policy Considerations*

The next question is whether the government's decision as to the appropriate action for notifying the public of the existence of the sill was based on considerations of public policy. For essentially the same reasons enunciated by the district court, we hold that the government's decision was grounded in public policy considerations. The underlying facts on this point are not disputed by appellants. As the district court stated:

> In determining when and whether to mark a public work such as the sill in question, the United States considers, among other things: the degree of danger an object poses, the vessel traffic type and density, the location of the object in relation to the navigable channel, the history of vessel accidents, and the feasibility and economics, including costs, of erecting and maintaining physical markers in light of the available resources. . . . These are policy factors which require weighing competing interests to decide a course of action. These guidelines, leave room for and indeed require, the exercise of policy judgment based upon the resources available and the relative risks to the public health and safety from alternative actions.

*Theriot v. United States*, Nos. 96-1532, 96-1954, slip op. at 7 (W.D. La. Aug. 19, 1997). This finding is fully supported by Shilling's testimony and is not disputed by appellants. Thus, it is clear that the government's decision whether to place a warning sign or marker at the sill's location was a discretionary decision that required judgment or choice and one that was grounded in public policy considerations. *Accord Drake Towing Co. v. United States*, 765 F.2d 1060, 1064 (11th Cir. 1985) (stating that "the initial decision to place aids to navigation such as the temporary buoys in this case is within the Coast Guard's discretion"); *see also Indian Towing Co. v. United*

15

*States*, 350 U.S. 61, 69, 76 S. Ct. 122, 126-27 (1955) (holding that decision to operate a lighthouse service as an aid to navigation is an exercise of discretion); *Wiggins v. United States*, 799 F.2d 962, 966-67 (5th Cir. 1986) (holding that Corps' decision not to remove submerged unmarked piling was within discretionary function exception).

C.    *Negligence of Hamilton*

The district court's finding that Hamilton negligently operated the vessel is a finding of fact, which we will not set aside unless clearly erroneous.  *See Coumou*, 107 F.3d at 295.  The standard of care applied by the district court is a question of law, which we  review de novo.  *See id.*; *Weyerhaeuser Co. v. Atropos Island*, 777 F.2d 1344, 1347 (9th Cir. 1985).  State Farm and Hamilton (collectively "State Farm") assert that in finding Hamilton negligent, the district court, relying on *Gemp v. United States*, 684 F.2d 404, 408 (6th Cir. 1982),  applied an inappropriately high standard of care when it concluded that "[p]leasure craft operators are charged as a matter of law with knowledge of information shown on nautical charts." *Theriot*, Nos. 96-1532, 96-1954, slip op. at 15.  State Farm argues that Fifth Circuit jurisprudence does not impute knowledge of nautical charts on recreational mariners that are not required by law to equip their vessels with such charts.[**]  They assert that the appropriate standard of care is that of a reasonably prudent person under the circumstances and that finding Hamilton negligent based on his failure to consult the NOAA chart is reversible error.

We agree that the appropriate standard of care in an allision case is reasonable care under

---

[**] As appellants point out, federal regulations require certain vessels to carry Marine Charts of the area published by the National Ocean Service, but these regulations do not apply to vessels under 1600 gross tons.  *See* Navigation Safety Regulations, 33 C.F.R. §§ 164.01, .33 (1998).  The parties stipulated that the Boston Whaler weighs less than 1600 gross tons.

16

the circumstances.  *See Nettles v. Ensco Marine Co.*, 980 F. Supp. 848, 853 (E.D. La. 1997)

(citing 2 THOMAS J. SCHOENBAUM, ADMIRALTY & MARITIME LAW § 14-2, at 255 (2d ed. 1994));

*see also Bunge Corp. v. M/V Furness Bridge*, 558 F.2d 790, 795 (5th Cir. 1977) (stating that the

moving vessel "must exhaust every reasonable possibility which the circumstances admit and

show that in each they did all that reasonable care required"); *Couch v. Bowman*, 263 F. Supp.

714, 716 (E.D. Tenn. 1966) (applying standard of reasonable care to recreational boat operator).

We conclude, however, that notwithstanding the court's reference to the *Gemp* rule in its

conclusions of law, the district court applied the reasonable care standard to reach its finding that

Hamilton was negligent.

The district court's ultimate finding of negligence on the part of Hamilton was premised in

part on its initial finding that "[a] reasonably prudent boater, unfamiliar with the area in which he

was navigating, would have consulted the applicable navigational chart of the area."  The wording

of this finding is a strong indication that the standard of care applied by the district court was

reasonableness under the circumstances.  The district court focused on the fact that Hamilton was

admittedly unfamiliar with the particular area in which he was operating the boat.  Additionally,

the district court's ultimate finding of negligence was based not only on Hamilton's failure to

consult the chart, but also upon his admitted unfamiliarity with the hazards of the area, and his

unsafe speed in light of those circumstances.  Specifically, the district court stated:

> We also find that Herbert Hamilton was negligent in the operation of the boat.
> Hamilton was at the helm of the craft at the time of the accident.  As such, he was
> charged with familiarizing himself with the various depths and hazards of the
> surrounding waters.  Hamilton was admittedly unfamiliar with the area, and did not
> consult authorized navigational charts.  He proceeded at an excessive and unsafe
> speed in light of his professed unfamiliarity with the area.  Hamilton's actions
> and/or inactions were a proximate cause of the accident.

17

*Theriot*, Nos. 96-1532, 96-1954, slip op. at 10. Thus, the district court's finding of negligence rested upon the reasonableness of Hamilton's conduct under the circumstances. Moreover, this finding is not clearly erroneous based on the district court's underlying factual findings.

The underlying facts pertaining to the district court's finding of negligence are as follows. Hamilton was not familiar with the area that he was operating the boat, although he had fished a different cut in South Pass on one prior occasion. None of the other occupants had operated a boat in this area, nor were they familiar with it. Neither Hamilton nor any of the others had consulted NOAA chart 11361 or any other navigational chart depicting the depths, obstructions, or hazards in South Pass. The sill was marked on NOAA chart 11361 and had been charted since 1960. The usual noticeable rolling break in the water indicating the sill's location was not present. The coast guard's Notice to Mariners warned of the danger posed by the sill and was available to anyone upon request. Hamilton did not consult the Notice to Mariners prior to operating the boat. There was no physical marker or warning sign at the location of the sill. Estes was looking in the water immediately before the accident and could not see the sill below the surface, nor could anyone else. Hamilton did not exit the cut at the same location that Estes had safely entered, but instead exited closer to the northern bank of the cut. As Hamilton prepared to enter the Gulf, he accelerated to approximately 15 miles per hour, which was an unsafe speed under the circumstances.

The only fact susceptible to challenge is the finding that Hamilton operated the vessel at an unsafe speed under the circumstances. On this point, Davis, Theriot, and Estes all testified that nothing in Hamilton's operation of the vessel caused them any concern for their safety. Berg, the civil engineer for the Corps who conducts surveys and investigates accidents in the South Pass

18

area, testified that he safely entered the cut in a vessel very similar to Estes' Boston Whaler by trimming his engines up and letting the current take him through. Shilling testified that a prudent mariner would familiarize himself with the area and in any event, would be very careful going through an unfamiliar area. Hamilton testified that he monitored the depth finder while at the helm and it was fluctuating between ten and eleven feet, which normally would be sufficient depth for this size boat. However, Hamilton also admitted that because the depth finder was located on the rear of the boat, the front of the boat would already have passed over the area before he would be able to determine the depth. In light of Hamilton's admitted unfamiliarity with the area or its hazards, his decision to exit the cut at different location than they had safely entered, and the inability of the depth finder to determine the depth at the front of the vessel, the district court's finding that the Hamilton operated the vessel at an unsafe speed under the circumstances was not clearly erroneous. Consequently, the ultimate finding that Hamilton negligently operated the boat was not clearly erroneous. Moreover, this finding is consistent with decisions in other circuits finding a boat operator negligent when, along with other factors, he failed to familiarize himself with the area by consulting charts, notices to mariners, or approved light lists. *See, e.g.*, *Andrews v. United States*, 801 F.2d 644, 649 (3rd Cir. 1986) (evidence that recreational boaters were "piloting their boats in wholly unfamiliar waters without the benefit of personal experience, navigational charts, or even the ability to recognize the standard maritime road symbols" supported finding of negligence); *Albinder v. United States*, 685 F. Supp. 45, 46 (S.D.N.Y. 1987) (holding that hired boat pilot who was unfamiliar with the area "was negligent in not having available up-to-date navigational guides made available to the public by the U.S. Government and in selecting a route which departed from the plainly indicated channels and resulted in the

19

accident").

Our conclusion is not affected by the fact that federal regulations do not require a vessel of this size to be equipped with NOAA chart 11361. *See* 33 C.F.R. §§ 164.01, 164.33. A finding of negligence need not be premised on the violation of a specific statute or regulation. *See* 2 SCHOENBAUM, § 14-2, at 255 ("Liability for collision may be imposed even in the absence of a statutory violation, if there is negligence."). As stated above, the test is reasonable care under the circumstances. Thus, the fact that Hamilton was not required by statute or regulation to consult the chart does not undermine the district court's finding that Hamilton was negligent under the prevailing conditions at the time of the accident.

### III. CONCLUSION

In sum, the decision of the United States to rely on charting the sill and notifying the public through the Notices to Mariners rather than by physically marking the location of the sill at the site was within the discretionary function exception to the SAA. Thus, the United States was immune from liability and the district court was without jurisdiction and properly dismissed the claims against the United States. As to the finding that Hamilton was negligent, the district court applied the appropriate standard of care, that of a reasonable person under the circumstances. The district court's finding of negligence was not clearly erroneous as it is supported by the court's underlying factual findings and is consistent with the evidence as a whole.

AFFIRMED.