Irena LAKOMY, Peter Reil, Peter Le-
bens Andreas Weber, and Ulrike Bau-
mann, Plaintiffs–Appellees,

v.

UNITED STATES of America,
Defendant–Appellant.

No. 02–10439.

United States Court of Appeals,
Fifth Circuit.

July 11, 2003.

Before KING, Chief Judge, DAVIS, Circuit Judge, and VANCE,* District Judge.

PER CURIAM.**

Plaintiffs–Appellees were flight attendants who sustained injuries when the pilots of their aircraft took evasive measures to avoid what the pilots perceived to be an imminent mid-air collision. After a bench trial, the district court entered judgment in favor of the flight attendants, concluding that air traffic controllers' negligence caused appellees' injuries and that the United States is liable for their negligence under the Federal Tort Claims Act ("FTCA"). *See* 28 U.S.C. §§ 1346(b), 2671–2680. Because we find that appellees presented insufficient evidence to conclude that the air traffic controllers' negligence was a proximate cause of the alleged injuries, we reverse.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Incident

This appeal arises from an in-flight accident aboard Lufthansa Airlines Flight 436 ("Lufthansa 436") that occurred when the plane was en route from Dallas–Fort Worth Airport ("DFW") to Houston on June 21, 1996. Plaintiffs–Appellees are Irena Lakomy, Peter Reil, Peter Lebens, Andreas Weber, and Ulrike Baumann, all German nationals and flight attendants aboard Lufthansa 436. Captain Rudiger Werner was the pilot in command of the

aircraft, but he was designated the "pilot not flying" on this flight. His co-pilot was the "pilot flying." Lufthansa 436 is an Airbus A–340 equipped with a Traffic Collision Avoidance System ("TCAS"), a self-contained, on-board collision-avoidance system that is independent of ground-based radar and that derives its information from devices aboard other aircraft in flight. The use of the TCAS on Lufthansa 436 was mandated by law. Congress intended TCAS to be a "back-up" protective measure to the regular responsibilities of pilots and air traffic controllers to avoid collisions. *See* 49 U.S.C. § 44716; 14 C.F.R. § 121.356.

TCAS makes second-by-second calculations of the trajectories of aircraft in its vicinity. When the risk of a collision exceeds a certain threshold, TCAS issues a "traffic advisory." The size of the bubble of protection provided by TCAS is unknown to both the pilot and air traffic control. It issues the traffic advisory 40 seconds before the intruding aircraft's closest point of approach to the aircraft from which the TCAS is making its calculations. Pilots are instructed to respond to a TCAS traffic advisory by attempting to identify the other aircraft visually. If the threat of collision does not abate, TCAS issues a "resolution advisory" approximately 15 seconds later. This is 25 seconds before the intruding aircraft's closest point of approach to the aircraft from which the TCAS is making its calculations. Along with the resolution advisory, TCAS issues an aural command directing the pilots how to steer the aircraft to avoid the threat. Airlines in general, and Lufthansa in particular, instruct pilots that unless

---

* District Judge of the Eastern District of Louisiana, sitting by designation.

** Pursuant to 5th Cir. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5th Cir. R. 47.5.4.

they have visually identified the aircraft posing the threat and have determined that no collision threat exists, they *must* follow the aural command issued by TCAS.

In addition to TCAS, pilots also rely on ground-based air traffic controllers ("ATCs") to provide certain air safety services. ATCs are employees of the Federal Aviation Administration. On the day of the incident, Lufthansa 436 was flying under Instrument Flight Rules ("IFR"), under which its flight pattern out of DFW was directed by air traffic control at the DFW Terminal Radar Control facility ("TRACON"). ATC Gregory Hood, acting under the supervision of ATC John Sullivan, was responsible for the airspace in which Lufthansa 436 operated. ATCs Hood and Sullivan were responsible for an area of air space totaling 1,000 square miles. Importantly, despite the assistance that they receive from ATCs and TCAS, pilots are ultimately in command of an aircraft and are directly responsible for the operation of that aircraft. *See* 14 C.F.R. § 91.3.

As Lufthansa 436 departed DFW, the ATCs instructed it to ascend to a cruise altitude of 17,000 feet. Approximately five minutes into its flight, Lufthansa 436 reached an altitude of 10,000 feet. The flight attendants removed their safety belts and started to prepare beverage service in the rear of the aircraft. Meanwhile, a Cessna 421 entered Hood's and Sullivan's airspace. The Cessna 421 is a smaller airplane that flew under Visual Flight Rules ("VFR"), which it was permitted to do because of the clear skies. Pilots flying under VFR trust their eyesight to avoid mid-air collisions. They are not required to pre-clear a flight plan with air traffic control and are under no obli-

gation to maintain a particular course. As it flew through the airspace manned by ATCs Hood and Sullivan, the Cessna maintained an altitude of 14,500 feet en route to Liberal, Kansas. It was equipped with a Mode C transponder, which, at 1200 code, caused the Cessna to appear on ATC Hood's radar screen as an "unidentified" aircraft about four minutes before the incident at issue took place. Several minutes after it first appeared on Hood's radar as an unidentified aircraft, and less than one minute before the incident, the Cessna contacted ATC to request traffic information. This occurred at 19:27:16 Universal Coordinated Time, or 2:27:16 p.m. Central Daylight Time. The Lufthansa 436 flight crew heard the exchange between the Cessna and the ATCs, but they did not correlate the Cessna's reported position with their own flight route. At 19:27:36, ATC Hood assigned the Cessna a transponder code, which rendered the Cessna a "radar identified" aircraft.

Shortly before 19:27:51, Lufthansa 436's TCAS issued a traffic advisory. At 19:27:51, Lufthansa 436 radioed to ATC that "we have a traffic ah . . . ." The communication was cut off midsentence by a communication to ATC from an American Airlines flight. In response to the TCAS traffic advisory, the Lufthansa flight crew attempted without success to identify the intruding aircraft visually. TCAS then issued a resolution advisory and an aural command to "descend, descend."[1] This occurred when the aircraft was at 13,744 feet (which is designated as Class E airspace), climbing at a rate of approximately 2,600 feet per minute. It was the first time this Lufthansa flight crew had ever received a TCAS resolution advisory. Believing that a mid-air collision was imminent, the Luf-

---

1. The flight recorder recorded a TCAS down advisory of "don't climb greater than 500 feet per minute." The district court, however, credited Captain Werner's testimony that the aural command issued was "descend, descend."

thansa flight crew performed a series of evasive maneuvers.

The Lufthansa training manual instructs pilots that a TCAS resolution advisory does not require abrupt or rapid pitch control inputs, as the advisory affords an ample 25 seconds to alter the aircraft's trajectory smoothly. The Lufthansa flight crew's inputs, however, were anything but smooth. The First Officer, who was the "pilot flying," moved his sidestick up full throttle. Under Lufthansa flight procedures, Captain Werner, as the "pilot not flying," should not have made any inputs to the aircraft's sidestick. He nonetheless moved his sidestick nose-down, then nose-up 1.3 seconds later. The pilots inputted a number of additional sidestick movements, including side-to-side movements not commanded by TCAS. The consecutive inputs sent the flight attendants in the rear of the aircraft hurtling against the aircraft's ceiling, and then against its sides, and then against its ceiling once more. By all accounts, the rear of the aircraft was a "war zone." The flight attendants suffered serious injuries.

After Lufthansa 436 began its evasive maneuvers, ATC Hood radioed Lufthansa 436 to say that there was traffic in its vicinity—the Cessna—at "one o'clock and a mile northbound fourteen thousand five hundred." This occurred at 19:27:59, eight seconds after Lufthansa 436 radioed ATC to report the TCAS traffic advisory. Several seconds later, ATC Hood informed the Cessna of the position of Lufthansa 436. The Cessna responded, "Yeah, we've been watchin' him."

The record makes clear that the two aircraft were never going to collide. Appellees' expert witness and the government's expert witness both testified that the Cessna crossed the projected flight path of Lufthansa 436 five miles ahead of Lufthansa 436. The government's expert added that when the Cessna crossed Lufthansa 436's flight path, the Cessna was 2,000 feet higher than Lufthansa 436. After the Cessna crossed Lufthansa 436's projected flight path, the two aircraft passed each other side by side. It was at this time, when the planes' flight paths were no longer merging and they were heading in opposite directions, that the TCAS issued its traffic advisory and then its resolution advisory. As the aircraft passed each other, they reached their closest point of approach. Experts determined, and the district court found, that when the aircraft were at their closest point vertically—approximately 700–800 feet—they were 2.76 miles apart horizontally. At their closest point horizontally—1.38 miles apart—they were 1100–1200 feet apart vertically. The only threat of a collision was that the Cessna's pilots might suicidally veer their aircraft into the Lufthansa.

The parties nevertheless contest whether the ATCs should have prevented the planes from coming this close to each other. The FAA Handbook 7110.65J sets forth the responsibilities of ATCs. The Handbook in effect on the day of the incident instructed ATCs that "the primary purpose of the ATC system is to prevent a collision between aircraft operating in the system and to organize and expedite the flow of traffic." U.S. DEP'T OF TRANSP., FED. AVIATION ADMIN., AIR TRAFFIC CONTROL HANDBOOK, 7110.65J (the "HANDBOOK"), § 2-1-1. The first priority duty of an ATC is to separate aircraft and issue "safety alerts":

Issue a safety alert to an aircraft if you are aware the aircraft is in a position/altitude which, in your judgment, places it in unsafe proximity to terrain, obstructions, or other aircraft. . . . The issuance of a safety alert is a first priority once the controller observes and recog-

nizes a situation of unsafe aircraft proximity to terrain, obstacles, or other aircraft. Conditions, such as workload, traffic volume, the quality/limitations of the radar system, and the available lead time to react are factors in determining whether it is reasonable for the controller to observe and recognize such situations.

HANDBOOK, § 2–1–6.

In addition to issuing safety alerts, ATCs apply "merging target procedures" as follows:

a. Except while they are established in a holding pattern, apply merging target procedures to all radar identified:

(1) Aircraft at 10,000 feet and above.

(2) Turbojet aircraft regardless of altitude.

(3) Presidential aircraft regardless of altitude.

b. Issue traffic information to those aircraft listed in subpara a. whose targets appear likely to merge unless the aircraft are separated by more than the appropriate vertical separation minima.

HANDBOOK, § 5–1–8. When their workload permits, ATCs also issue traffic advisories:

Where no separation minima applies, such as for VFR aircraft outside of Class B and Class C airspace, or a TRSA, issue traffic advisories to those aircraft on your frequency when in your judgment their proximity warrants it.

HANDBOOK, § 2–1–21.

ATCs are required to exercise their own judgment in determining whether aircraft come within an unsafe proximity. The Handbook does not oblige ATCs to prevent an on-board TCAS system from issuing its own traffic advisory or resolution advisory. Indeed, ATCs are not even aware of the bubble of protection provided by TCAS.

Here, the ATCs did not issue a safety alert and did not apply merging target procedures. They issued Lufthansa 436 a traffic advisory at 19:27:59, but this was too late to prevent appellees' injuries. By that time, the TCAS had already issued a resolution advisory, and the Lufthansa flight crew was already engaging in abrupt evasive maneuvers. At the time of the incident, the ATCs' workload level was "moderate." ATCs Hood and Sullivan testified that they could not recall any specific incident at the radar tower that prevented them from issuing a traffic advisory before the Lufthansa flight crew began their maneuvers.

*B.  Legal Proceedings*

In federal district court, the flight attendants asserted claims of negligence against the United States, by and through its agency, the FAA. Plaintiffs–Appellees sought damages for personal injuries pursuant to the FTCA. The United States moved to dismiss for lack of subject matter jurisdiction, contending that the discretionary function exception to the FTCA applies to this lawsuit because the allegations give rise to impermissible judicial second-guessing of the FAA Administrator's decision to separate the layer of air safety protection provided by TCAS from the layer of protection provided by ground-based ATCs. The United States also asserted that ATCs Hood and Sullivan were not negligent, and that their negligence, if any, did not cause appellees' injuries.

After a two-day bench trial, the district court determined that the Lufthansa 436 flight crew's response to the TCAS resolution advisory was "excessive, unnecessary, and contrary to" their TCAS training, and that the flight crew's negligence was a proximate cause of the flight attendants' injuries. The district court also found that ATCs Hood and Sullivan were negligent

for failing to provide a timely traffic advisory, to issue a safety alert, and to apply merging target procedures. The district court found that the ATCs' negligence was a proximate cause of the flight attendants' injuries. Further, the court found that the ATCs were more responsible than the Lufthansa flight crew and apportioned the fault at 55%–45%. The court also found it "unnecessary" to reach the United States' motion to dismiss for lack of jurisdiction because the lawsuit does not challenge an action of the Administrator of the FAA. The court reasoned that plaintiff's allegations challenge the actions of ATCs and not the Administrator of the FAA.

The United States timely appealed the trial court's findings on subject matter jurisdiction and proximate causation.

## II. STANDARD OF REVIEW

The application of the discretionary function exception to the FTCA is a question of law that we review *de novo*. *See Theriot v. United States*, 245 F.3d 388, 394 (5th Cir.1998). To the extent that the district court made factual findings that underlie its decision, these factual findings are binding unless clearly erroneous. *See id.* The district court's finding as to proximate cause is also a factual finding that is reviewed for clear error. *See Gavagan v. U.S.*, 955 F.2d 1016, 1019 (5th Cir.1992). A finding is "clearly erroneous" when, although there is evidence to support it, the reviewing court examines all of the evidence and "is left with the definite and firm conviction that a mistake has been committed." *Theriot*, 245 F.3d at 395 (citing *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). A trial court's decision to credit the testimony of one witness over that of another, unless internally inconsistent, is virtually never clear error. *See id.* Further, when the trial court is faced with testimony susceptible to multiple conclusions, its factual determinations stand so long as they are plausible, even if the evidence may have been weighed otherwise. *See id.*

## III. DISCRETIONARY FUNCTION EXCEPTION

Appellant challenges the district court's determination that the United States is not immune from this lawsuit under the discretionary function exception to the FTCA. The FTCA provides that the United States shall be liable "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. This broad waiver of sovereign immunity is subject to a number of exceptions, among them the discretionary function exception:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). The nature of the conduct, and not the status of the actor, governs whether the exception applies. *United States v. Gaubert*, 499 U.S. 315, 322, 111 S.Ct. 1267, 1272, 113 L.Ed.2d 335 (1991). The applicability of the discretionary function exception involves a two-step analysis.

First, because the exception covers only acts that are discretionary in nature, we must determine whether the challenged act involves an element of "judgment or choice." *Gaubert*, 499 U.S. at 322, 111 S.Ct. at 1272; *Theriot*, 245 F.3d at 397. This requirement is not satisfied if a feder-

al statute, regulation or policy specifically prescribes the course of action that the government employee must follow, for in this situation the employee " 'has no rightful option but to adhere to the directive.' " *Gaubert*, 499 U.S. at 322, 111 S.Ct. at 1272 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536, 108 S.Ct. 1954, 1958–59, 100 L.Ed.2d 531 (1988)). Second, we examine whether the judgment or decision is grounded on considerations of social, economic, or political public policy. *Id.* The exception applies to any judgment or choice that is "susceptible to policy analysis." *Id.* at 325, 111 S.Ct. at 1275. That is because the purpose of the discretionary function exception is to prevent judicial "second-guessing" of legislative and administrative decisions grounded in social, economic and political policy through tort actions.[2] *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814, 104 S.Ct. 2755, 2765, 81 L.Ed.2d 660 (1984). If a regulation allows for employee discretion, the existence of the regulation in and of itself creates a presumption that the discretionary act involves consideration of the public policies that led to the promulgation of the regulation. *Gaubert*, 499 U.S. at 324, 111 S.Ct. at 1274.

Before it is possible to address whether a government action involved judgment or choice that is grounded in public policy, it is first necessary to identify the government action challenged. The United States argues that appellees challenge an action of the Administrator of the FAA.[3] The Administrator of the FAA is autho-

rized by statute "to reduce or eliminate the possibility or recurrence of accidents in air transportation." 49 U.S.C. § 44701(c). In so doing, the Administrator publishes the Handbook and employs ATCs to carry out its policies and procedures. The Administrator also promulgates regulations that require certain aircraft, including Lufthansa 436, to employ TCAS. *See* 49 U.S.C. § 44716; 14 C.F.R. § 121.356.

The United States asserts that the Administrator exercised her discretion by deciding that ATCs should perform certain services to ensure air traffic safety and by further deciding that the TCAS should perform an air safety service separate and distinct from that performed by ATCs. The United States notes that ATCs are not obliged to prevent TCAS from issuing a traffic advisory or a resolution advisory. Indeed, ATCs do not even know what circumstances give rise to such advisories. The United States argues that appellees' allegations in effect represent an impermissible attempt to second-guess an exercise of the Administrator's discretion by holding ATCs liable for failing to prevent a TCAS resolution advisory. Appellees argue, and the district court agreed, that their allegations do not challenge the Administrator's discretionary authority.

■ We agree with the district court that the nature of this lawsuit does not give rise to judicial second-guessing of the Administrator's discretion. Appellees assert that ATCs negligently permitted the two aircraft to come within an unsafe proximity. Appellees *do not* assert that ATCs

---

2. An additional purpose of the discretionary function exception is to protect the government from liability that would "seriously handicap efficient government operations." *Varig Airlines*, 467 U.S. at 814, 104 S.Ct. at 2765.

3. Notably, the United States does not assert that appellees' complaint calls upon the courts to second-guess the actions of ATCs. Rather, the government expressly limits its discretionary function exception argument to whether appellees' allegations give rise to judicial second-guessing of the action of the Administrator of the FAA.

negligently permitted the TCAS to issue a traffic advisory and resolution advisory. Nor do appellees question the judgment of the Administrator in establishing a system in which the TCAS issues warnings separate and independent from those issued by ATCs. They do not, for example, urge the Court to impose a new obligation upon ATCs to prevent TCAS resolution advisories. Therefore, although it is true that the Administrator of the FAA decided not to require ATCs to prevent TCAS resolution advisories, this lawsuit does not challenge that decision.

## IV. PROXIMATE CAUSATION

The liability of the United States arises under the FTCA only when the law of the state where the act or omission occurred would impose it.[4] 28 U.S.C. § 1346(b); *Johnson v. Sawyer*, 47 F.3d 716, 727 (5th Cir.1995). Here, that state is Texas, and under Texas law the ordinary rules of negligence apply to aircraft accidents. *See, e.g., Hayes v. United States*, 899 F.2d 438, 443 (5th Cir.1990). The common law doctrine of negligence in Texas consists of (1) a legal duty owed by one person to another; (2) a breach of that duty; and (3) damages proximately resulting from the breach. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). Proximate cause comprises both "cause in fact" and foreseeability. *Excel Corp. v. Apodaca*, 81 S.W.3d 817, 820 (Tex.2002); *Gutierrez v. Excel Corp.*, 106 F.3d 683, 687 (5th Cir.1997). A "cause in fact," which is also called a "but for" cause, is that which was a substantial factor in causing the injury *and* without which the harm would

not have occurred. *Apodaca*, 81 S.W.3d at 820. Under Texas law, a finding of cause in fact must be established by probative evidence and cannot be supported by mere conjecture, guess, or speculation. *See id.* It may, however, be based on either direct or circumstantial evidence. *See id.*

The district court determined that "[h]ad the ATCs properly followed the [Handbook's] procedures, the harm to [appellees] would not have occurred." This, of course, is a factual finding reviewed for clear error. *Gavagan*, 955 F.2d at 1019. Whether it is supported by sufficient evidence is a question of federal law, *see, e.g., Ayers v. United States*, 750 F.2d 449, 452 (5th Cir.1985); *Wardlaw v. Inland Container Corp.*, 76 F.3d 1372, 1375 n. 1 (5th Cir.1996), but we refer to state law to determine the kind of evidence that must be produced. *Patin v. Thoroughbred Power Boats, Inc.*, 294 F.3d 640, 647 n. 12 (5th Cir.2002) (citing *Tutor v. Ranger Ins. Co.*, 804 F.2d 1395, 1398 (5th Cir.1986)). Our inquiry requires a review of the entire record, including both direct and circumstantial evidence, to see whether we are left with the definite and firm conviction that a mistake has been committed. *Theriot*, 245 F.3d at 395.

The district court did not elaborate on the evidence on which it based its finding of proximate causation. It accepted appellees' argument that had the ATCs properly followed the Handbook, no evasive maneuvers would have been required. For this to be true, the ATCs' actions must have been sufficient to forestall a TCAS resolution advisory. This follows because the

---

4. The FTCA makes the United States liable in tort "in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. It is liable for certain damages "caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred.*" 28 U.S.C. § 1346(b) (emphasis added).

Lufthansa flight crew took evasive action in response to the TCAS resolution advisory, and they testified that they would have responded with similarly abrupt evasive maneuvers whenever it issued such a resolution advisory. Captain Werner testified that when the TCAS issues a resolution advisory, he has "only one thing in my mind," and that is "to carry out the prescribed maneuver." He "had to be quite clear about the fact that if I did not do anything at that moment, that the very next moment it would come to a mid-air collision." Captain Werner testified that it is "very difficult" for him to make a smooth adjustment "without any injuries."[5] The inquiry, therefore, is whether the ATCs' negligence is a cause without which no TCAS resolution advisory would have issued. *Apodaca*, 81 S.W.3d at 820.

At trial, appellees produced only two pieces of evidence on point. First and foremost, appellees rely on Captain Werner's testimony that had the ATCs issued a timely traffic advisory, he would have "reduced the [Lufthansa's] climb rate." He did not testify to the extent of any such reduction or the impact that such a reduction would have had on the aircraft's altitude. Second, appellees fall back on the testimony of their expert witness, Andrew Hayes, who stated that the timely issuance of a traffic advisory "allows the flight crews to plan ahead and operate the aircraft in a manner so they don't have to make abrupt maneuver[s] when being surprised by an opposing aircraft." When asked whether the application of merging target procedures or the timely issuance of a traffic advisory would "have made an outcome different than it is in this case," Hayes responded "yes."

Captain Werner's testimony that he would have reduced the aircraft's climb rate does not support the flight attendant's case of proximate causation. TCAS does not warn pilots of only impending, imminent collisions. Rather, TCAS issues a resolution advisory when the risk that a collision might occur in 25 seconds exceeds a certain threshold. The record reflects, and the district court found, that the size of the bubble of protection provided by TCAS is unknown to both the pilot and air traffic control. The size of the bubble was also unknown to the district court. In this case, TCAS issued a resolution advisory even though the two aircraft were never on a collision course. It issued a resolution advisory *after* the Cessna had crossed the projected flight path of Lufthansa 436, when the two aircraft were passing each other, side by side, heading in opposite directions.

■ Because the size of the bubble of protection provided by TCAS is unknown, it is impossible to conclude that some kind of reduction in the climb rate would have steered the aircraft clear of this bubble. Perhaps evidence of a dramatic change in the aircraft's altitude would be sufficient, but appellees produced no such evidence. Captain Werner did not indicate the effect that his hypothetical reduction in the climb rate would have had on the aircraft's altitude. The record does not supply the facts and figures necessary to make an independent calculation. Although we can reasonably assume that a "reduction in the climb rate" would have had some impact on the aircraft's altitude, we cannot assume that such a reduction would have steered the aircraft clear of the TCAS's

5. Pilots need not abide the aural command issued along with a TCAS resolution advisory *only* if they have identified the intruding aircraft visually and have determined that no collision threat exists. Here, the Lufthansa flight crew tried without success to identify the intruding aircraft visually.

bubble of protection given that the size of this bubble is unknown.

Hayes's testimony does not support the flight attendants' case of proximate causation either. He offers conclusory testimony that a timely traffic advisory "allows the flight crews to plan ahead and operate the aircraft in a manner so they don't have to make abrupt maneuver[s] when being surprised by an opposing aircraft." He does *not* testify that the timely issuance of a traffic advisory prevents TCAS from issuing a resolution advisory. Nor does he testify that the Lufthansa flight crew would have reacted to a TCAS resolution advisory with anything but abrupt maneuvers. Indeed the evidence was quite to the contrary. As we have noted, Captain Werner testified that (1) he was required to respond to the TCAS resolution advisory unless he could identify the intruding aircraft visually, which he could not do; (2) he believed the TCAS resolution advisory meant that a collision was imminent unless he took immediate action; and (3) it would be "very difficult" for him to respond to a TCAS resolution advisory without causing injuries.

The record, when viewed in its entirety, makes clear that appellees failed to meet their burden of presenting sufficient evidence of proximate causation. We are therefore left with the definite and firm conviction that a mistake has been committed. *Theriot*, 245 F.3d at 395.

## V.  CONCLUSION

The district court's determination that the United States of America is liable for appellees' injuries is reversed.

REVERSED.