EXCEL CORPORATION, Appellant,

v.

Jimmy APODACA, Appellee.

No. 07–99–0501–CV.

Court of Appeals of Texas,
Amarillo.

March 16, 2001.

Robert L. Craig, Jr., Eric G. Walraven, Craig, Terrill & Hale, Lubbock, for appellant.

Christopher Carver, Kevin Glasheen, Jeffrey Cluff, Fadduol, Glasheen & Valles, Lubbock, for appellee.

Before BOYD, C.J., and REAVIS and JOHNSON, JJ.

BOYD, Chief Justice.

In this proceeding, appellant Excel Corporation (Excel) appeals from a judgment in favor of appellee Jimmy Apodaca for injuries sustained during the course of his employment at Excel's meat packing plant in Friona, Texas. Finding no reversible error, we affirm the judgment of the trial court.

In seven issues, Excel contends error because (1) the trial court failed to strike a prospective juror for cause who admitted his bias against Excel; (2) there is no

evidence or insufficient evidence to support the verdict; (3) the trial court refused to submit an issue on sole proximate cause to the jury; (4) the trial court refused to submit an instruction on new and independent cause to the jury; (5) the trial court refused to submit separate negligence questions to the jury with respect to appellee's multiple injuries; (6) the trial court included a comment in the charge on the effect of the jury's answers to certain questions; and (7) the trial court awarded over three years of prejudgment interest which accrued due to appellee's delay of the trial.

This was a personal injury suit brought by appellee who was employed at Excel for 17 years. For the last three years of his employment, he worked as an operator of the cryovac 8300 machine, which required him to reach to grab a bag filled with meat, slide the meat to the work area, and place the bag on a plate, where the bag would be removed of air and sealed. The weight of the bag varied from three to twenty pounds.

Appellee completed an employee statement of injury on April 29, 1995, reporting pain in his hand, and subsequently sought treatment from multiple doctors claiming pain in his neck and lower back as well. Appellee was released to return to light duty work by two doctors, one on June 7, 1995, and one on June 13, 1995. Both doctors found it unlikely that appellee's cervical and lumbar spine injuries were work related. However, appellee never returned to work after May 8, 1995. He continued to seek medical treatment and subsequently underwent several operations. The costs associated with appellee's carpal tunnel injury were paid for by Excel until one physician reported in August 1995 that the injury seemed to be resolved. The costs associated with his other injuries were not paid for by Excel.

Excel is a non-subscriber under the Texas Workers' Compensation Act. Appellee filed this lawsuit alleging that his hand, neck, and back cumulative trauma injuries resulted from the negligence and gross negligence of Excel in failing to provide a safe workplace. The jury found Excel negligent and awarded actual damages of $536,472.

■ In its first issue, Excel claims that one of the jurors, Richard Bryarly, was clearly biased and prejudiced against Excel, which required that he be dismissed for cause. Because the trial court refused to do so in response to Excel's challenge, it was forced to use one of its peremptory strikes to exclude Bryarly and was therefore required to accept juror Jill Brown. In response, appellee asserts that Excel did not establish bias or prejudice as a matter of law, and even if there was bias or prejudice, the error was harmless because the juror that Excel was not able to exclude due to the exhaustion of its peremptory strikes voted against the verdict.

■ A person is disqualified to serve as a juror if he has a bias or prejudice in favor of or against a party in the case. Tex. Gov't Code Ann. § 62.105(4) (Vernon 1998). Bias, such as to disqualify a juror, means it must appear that the state of mind of the juror leads to the inference that he will not act with impartiality, while prejudice means prejudgment and therefore includes bias. *Compton v. Henrie*, 364 S.W.2d 179, 182 (Tex.1963). If a juror's bias or prejudice is established as a matter of law, the trial court must disqualify the juror. If it is not established as a matter of law, the trial court makes a factual determination as to whether the juror should be disqualified. *Malone v. Foster*, 977 S.W.2d 562, 564 (Tex.1998); *Swap Shop v. Fortune*, 365 S.W.2d 151, 154 (Tex.1963). The trial court's factual determination must be reviewed in the

light most favorable to the trial court's ruling and should not be disturbed absent an abuse of discretion. *Gant v. Dumas Glass and Mirror, Inc.,* 935 S.W.2d 202, 207 (Tex.App.—Amarillo 1996, no writ); *Sullemon v. U.S. Fidelity & Guar. Co.,* 734 S.W.2d 10, 15 (Tex.App.—Dallas 1987, no writ).

The voir dire of juror Bryarly was as follows:

\* \* \*

MR. HATCH: Let me ask you, Mr. Bryarly, you indicated in your questionnaire that you feel you might be biased in favor of the employee. Do you remember stating that?

JUROR BRYARLY: Yes. That's because of having been a member for twenty-something years, most of the time in my experience with the phone company, the company has been wrong and the union has been right, or the employers have been wrong and employees have been right most of the time.

MR. HATCH: Okay.

JUROR BRYARLY: So I would tend to be a little more favorable towards the Plaintiff than the Defendant.

MR. HATCH: All right. And that's fine. That's based on your personal experiences in the past. Would it be fair to say that even before you heard evidence and before you looked at any documents or analyzed any witnesses from the stand, that you are already, in the back of your mind, have got the Plaintiff a step ahead of the Defendant?

JUROR BRYARLY: I'm just kind of leaning that way just from almost a habit. I mean, I can listen to the evidence and try to decide that way, but—

MR. HATCH: Is this going to cause you to interpret the witnesses, perhaps, differently because of which side they're on

or from which perspective they're giving testimony?

JUROR BRYARLY: Oh, probably not. I will try to deal with facts as much as possible and try not to let my personal dealings and experiences influence it, but—

MR. HATCH: Well, I just—

JUROR BRYARLY:—I might tend to lean towards the Plaintiff.

MR. HATCH: The key question is whether you could be successful in putting aside your past experiences?

JUROR BRYARLY: No way of knowing. Never been in a situation like this before.

MR. HATCH: All right. If in your mind at the conclusion of the evidence its pretty much a draw; let's say that both sides have evidence that support their case, are you going to be likely to break that tie in favor of the Plaintiff?

JUROR BRYARLY: Yes, I would.

MR. HATCH: Just because of past experience?

JUROR BRYARLY: If it came out to where, like, dead even between both sides, I would tend to favor the Plaintiff more than the Defendant.

MR. HATCH: Okay. Your Honor, based on those answers, we move to strike for cause.

THE COURT: Do you have questions?

MR. GLASHEEN: Yes. Sir, you know, we—you've heard me say before that we accept the burden of proof in the case.

JUROR BRYARLY: Right.

MR. GLASHEEN: When you hear conflicting testimony, like, for example from, you know, a company says one thing and an employee says another thing—

JUROR BRYARLY: Right.

MR. GLASHEEN:—that's one of a juror's number one jobs is to be a truth detector. That's the best machine ever invented. No machine ever invented is better than twelve people who collectively have hundreds of years of wisdom to decide who's telling the truth and what's right and what's wrong. You use your common sense. That's the other thing a jury brings is that we want you to use common sense to decide what's right and what's wrong and what's fair and who's telling the truth. And will you—will you—first of all, will you hold us to our burden of proof and require us to prove the case that more likely than not they were negligent; would you do that?

JUROR BRYARLY: Yes.

MR. GLASHEEN: Then would you base your determination—would you be willing to use your common sense and your ability to tell who's telling the truth and, you know, look for conflicts in the testimony to decide what's right and what's wrong?

JUROR BRYARLY: Well, suppose that I feel that both sides are telling the truth and that because they are looking at it from different perspectives each feels they're telling the truth, but, you know, one side's got to be not completely truthful or the evidence is going to be conflicting.

MR. GLASHEEN: I guess what I am getting at is everybody comes from backgrounds that are different that cause them to, you know, have these kinds of slight predispositions one way or the other. The question is, could you base your verdict on the evidence and instructions of the Court?

JUROR BRYARLY: I will try.

MR. GLASHEEN: Okay. That's all we can ask you to do. I guess the real question is, are you telling us that you maybe can't do that; or do you think that you can try to do that in good conscious [sic]?

JUROR BRYARLY: I'll try to do that.

MR. GLASHEEN: All right. Okay.

THE COURT: Well, you've kind of answered both ways, sir. What I really need to know is whether or not your personal feelings constitute bias or prejudice to any decision you might make in the case? You're the only one that can tell us that.

JUROR BRYARLY: I could try not to; that's all I can say. I can't—

THE COURT: So you don't believe—

JUROR BRYARLY: I can't answer that without hearing the evidence.

THE COURT: Sure, I understand that.

JUROR BRYARLY: I couldn't really say.

THE COURT: Right now your feelings are such that you don't believe it would affect any verdict you reach?

JUROR BRYARLY: Probably not. I could make myself try to be even—even handed in looking at the evidence.

THE COURT: Okay. And will you make the best effort to do that?

JUROR BRYARLY: I'll try to, yes.

THE COURT: I'll overrule challenges.

MR. HATCH: Okay. At least before you partook in all this this afternoon, you had indicated you would be biased in favor of the employee, correct, on the questionnaire?

JUROR BRYARLY: Right.

MR. HATCH: And against the employer? Have I quoted you properly?

JUROR BRYARLY: Yes, that's correct.

MR. HATCH: I just renew my objection based on that additional information, Your Honor.

* * *

Appellant argues in reliance on *Gum v. Schaefer*, 683 S.W.2d 803, 808 (Tex.App.—Corpus Christi 1984, no writ), that Bryarly admitted his bias in the jury questionnaire and in response to further questioning by counsel, and once the admission was made, Bryarly could not be rehabilitated by opposing counsel or the court. However, we have previously held that bias is not shown by answers to general questions, which are usually insufficient to satisfy the diligence required to determine the mindset of a veniremember with respect to disqualification for bias. *Gant*, 935 S.W.2d at 208. Without reaching a determination as to whether the unsworn answers on the jury questionnaire constitute competent evidence as to the juror's bias, we note that in response to more specific questions from counsel during voir dire posed as a result of the answers to the questionnaire, Bryarly stated, "I might tend to lean towards Plaintiff." Such a response does not establish bias as a matter of law, but merely raises a factual determination for the court. *Id.* at 207–08; *see also Sullemon*, 734 S.W.2d at 15.

■ However, Excel argues that the more important response was the one by Bryarly to the question as to whether he would break a tie in the evidence presented by the parties in favor of the plaintiff. In that response, Bryarly indicated that if the evidence was "dead even" between the parties, he would tend to favor the plaintiff. The key response that supports a challenge for cause is that the juror cannot be fair and impartial because his feelings are so strong in favor of or against a party that the verdict will be based on those feelings and not the evidence. *Gant*, 935 S.W.2d at 208. Bryarly's response does not conclusively establish that he could not fairly consider the evidence, because the hypothetical question posed by counsel was that the evidence presented was "dead even." No specific questions were posed to Bryarly by Excel at that point as to whether he could follow the court's instructions as to plaintiff's burden of proof. Therefore, we do not believe that bias was established by this statement as a matter of law. Upon additional questioning by appellee and the court, Bryarly stated he could hold the plaintiff to its burden of proof and would make his best effort to be even-handed in looking at the evidence. The trial court had the opportunity to observe Bryarly and was better able to evaluate his capacity for fairness and impartiality. *Goode v. Shoukfeh*, 943 S.W.2d 441, 453 (Tex.1997); *Sullemon*, 734 S.W.2d at 16. We therefore decline to find that the trial court abused its discretion in determining that Bryarly should not be stricken for cause.

■ Additionally, even if the trial court did commit error, we cannot conclude that such error probably caused the rendition of an improper judgment so as to necessitate a reversal of that judgment. *See* Tex. R.App.P. 44.1(a)(1). The juror that Excel was forced to accept due to its lack of sufficient peremptory strikes was Jill Brown. The charge shows that ten jurors signed the verdict but Brown was not one of them. Therefore, the verdict was returned by a sufficient number of qualified jurors. *Beavers v. Northrop Worldwide Aircraft*, 821 S.W.2d 669, 681 (Tex.App.—Amarillo 1991, writ denied); *see also Palmer Well Services, Inc. v. Mack Trucks, Inc.*, 776 S.W.2d 575, 577 (Tex. 1989). Excel's first issue is overruled.

■ In its second issue, Excel asserts the evidence is legally and factually insufficient to support a finding of negligence because there is either no evidence or insufficient evidence that Excel's actions or inactions were the proximate cause of appellee's injuries. Because Excel did not have the burden of proof on this issue, we

must first examine the record for any probative evidence, which when viewed in its most favorable light supports the judgment, while disregarding all evidence to the contrary. *Estate of Claveria v. Claveria*, 615 S.W.2d 164, 166 (Tex.1981). In reviewing Excel's factual sufficiency question, we must review the record for some probative evidence to support the finding, and we may reverse only if the decision is so against the great weight and preponderance of the evidence as to be manifestly unjust. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Raw Hide Oil & Gas v. Maxus Exploration Co.*, 766 S.W.2d 264, 276 (Tex.App.—Amarillo 1988, writ denied).

 Because Excel is a nonsubscriber to workers' compensation, appellee must establish negligence to recover. *Werner v. Colwell*, 909 S.W.2d 866, 868 (Tex.1995). The elements of negligence are a duty, the breach of that duty, and damages proximately caused by the breach of duty. *Doe v. Boys Club of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). Excel, as an employer, has the duty to use ordinary care to provide a safe workplace. *Werner*, 909 S.W.2d at 869; *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex.1993).

 Proximate cause consists of both cause in fact and foreseeability. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 313 (Tex.1987); *Nixon v. Mr. Property Management*, 690 S.W.2d 546, 549 (Tex.1985). Cause in fact means that the act or omission was a substantial factor in bringing about the injury and without which no harm would have occurred. *Id.* at 549. Foreseeability means that a person of ordinary intelligence would have anticipated the danger his negligence creates. *El Chico*, 732 S.W.2d at 313.

Excel claims that the only evidence at trial was conjecture on the part of appellee and one treating physician that appellee's injuries were work-related, which is insufficient to establish a negligence claim. At best, Excel argues, it did no more than create a condition which made appellee's injuries possible, which does not establish cause in fact. To support this argument, Excel relies heavily on *Werner*, in which an employee of a meat processor sued for injuries sustained while loading meat. The court discussed the principle that when the employee is doing the same character of work he has always done and other employees are required to do, there is no negligence. *Werner*, 909 S.W.2d at 869. Because there was no evidence that the lifting involved was unusual or posed a threat of injury, the court found the plaintiff had failed to establish a prima facie case. *Id.*

In response, appellee claims the evidence showed that Excel knew that the cryovac job "because of poor ergonomic design and extremely high repetition was likely to cause injuries to the workers." Appellee argues that Excel set the rate of production too high, failed to implement steps recommended by the Occupational Safety and Health Administration (OSHA) to reduce cumulative trauma injuries, analyze the job for ergonomic hazards, implement engineering and administrative controls, perform symptom surveys for early detection of injuries, and train him to recognize the symptoms of cumulative trauma. Finally, appellee contends that Excel's own records showed there was a 41.6% injury rate for cumulative trauma on his job, which was evidence that the position posed a risk of injury to him.

Cumulative trauma disorders (CTDs) result from wear and tear on joints, ligaments and tendons due to performance of repetitive work over a long period of time. Some of the risk factors associated with CTDs are repetition, exertion, vibration,

cold, and posture. OSHA has recommended actions to lessen these risk factors in meat packing plants, which include increasing the workers to perform a job or decreasing production rates and rest breaks. There is also a recognized need for proper training and medical management.

The job of cryovac operator requires the operator to stand and repetitively pull a bag of meat and place it on a machine plate where it is sealed. Mark Neill, the Human Resources Development Director for Excel, testified that employees work an eight-hour shift. They receive a 15-minute break in the morning and 30 minutes for lunch. No other formal breaks are allowed. Moreover, the area where appellee worked was kept at a temperature of 45 degrees. Testimony was that a product arrived approximately every three seconds, and workers were allowed infrequent and only small amounts of time to stretch or rest as downtime in the production line might allow. There was also testimony that the operator could control the speed of the conveyor belt, but would get in trouble for doing so. However, if an employee could find a willing coworker, he could change off jobs from time to time, and appellee admitted he had done so. Appellee also admitted that he had not bid for a different job than the cryovac operator, even though he had considerable seniority at the plant.

▆▆▆▆▆ Viewing the evidence in the light most favorable to the verdict, there was evidence to establish that the position of cryovac operator was subject to many of the risk factors associated with CTDs. Nevertheless, the fact that appellee was exposed to these risk factors is not enough to establish causation. *Gutierrez v. Excel Corp.*, 106 F.3d 683, 689 (5th Cir.1997). Appellee needed to prove he was exposed to enough of these risk factors for a suffi-

ciently long period of time and that he suffers from a specific injury classified as a CTD in order for a jury to be able to infer, absent direct evidence, that the work environment caused the injury. *Id.* Once appellee has shown that his injury was job related, he must still show that Excel negligently caused the injury by some act or omission. *Mosley v. Excel Corp.*, 109 F.3d 1006, 1014 (5th Cir.1997); *see also Leitch v. Hornsby*, 935 S.W.2d 114, 119 (Tex. 1996).

Dr. Lloyd Garland, a neurological surgeon, first saw appellee in May 1995. He found appellee to have a condition called bilateral pars interarticular defect in his lower back, where the cartilage never fuses into the bone. In the vast majority of cases, patients are born with this condition, although it can be made symptomatic by work. He said that by appellee's third visit, his tests did not document anything more than a minor root involvement and possibly a carpal tunnel syndrome, but nothing that should have been incapacitating. He released appellee to return to light duty work on June 7, 1995, although appellee did not do so. On cross-examination, Garland stated that a cervical disk injury is not what he normally thinks of as a repetitive stress disease, nor is the pars interarticular defect a repetitive stress injury. He did believe that repetitive motions can aggravate a pre-existing diseased disk. He observed appellee moving around his office and did not believe that appellee had the "type of pain that the average person would consider incapacitating." On redirect, Garland stated that at the time he saw appellee, his symptoms were not consistent with an on-the-job back injury.

Dr. Stephen Ringel, an orthopedic surgeon, first saw appellee on June 13, 1995, at which time appellee complained of numbness in his hand and neck pain.

However, appellee's range of neck motion was "pretty much normal" and "there was no complaint of pain or increased numbness in his fingers." He said the tests showed appellee had a pinched nerve in his neck and wrist, and a cervical disk herniation in his spine. Ringel's conclusions were that appellee had some tendonitis in the left shoulder, a pinched nerve in his neck and some mild pinching of the nerve in his wrist. He stated that 90 to 95 percent of ruptured disks resolve without surgery. Ringel recommended splinting the hand for the carpal tunnel syndrome. The first time appellee mentioned lower back pain to him was on June 28, 1995.

An EMG on August 3, 1995, showed that the carpal tunnel was no longer present by electrical criteria, however, there was still some nerve irritation in the neck. When Ringel was asked by Excel whether appellee's injuries were work related, he requested and was provided a videotape of the job that appellee performed. As a result, Ringel's conclusions were that the carpal tunnel was work related, but he did not "see anything in the movement or the motions or the activity of the job that would predispose him to having a herniated disk. . . ." Ringel felt the carpal tunnel syndrome had resolved by August 1995. Additionally, Ringel never considered appellee's lower back complaints to be work related because his understanding was that appellee was not working at the time that he first experienced back pain, and that if a person had not been working but had been resting, any back complaints should be improving. Although Ringel continued to treat appellee for several months, he released appellee to return to light duty work on June 13, 1995, but appellee never did so. On cross-examination, Ringel stated that appellee's job would not predispose him to have herniated disks any more than a lawyer's job. While he agreed that work could contrib-ute to make pre-existing problems more symptomatic, he did not feel that the work appellee was doing put any strain on his neck or back.

Mark Scioli, an orthopedist, testified that he initially saw appellee on December 7, 1995, over seven months after appellee first reported an injury to Excel, and six months after appellee last performed any work at Excel. He stated that appellee had a herniated disk in his neck and lower back. Appellee underwent a lumbar laminectomy on February 5, 1996, and an anterior diskectomy on December 4, 1996. Scioli also averred that appellee had nerve compression in his neck and wrist. To correct those problems, he advised appellee to undergo a carpal tunnel release, which was performed on May 22, 1996. Scioli believes that appellee may need a fusion of the disks in his back in the future. He stated that appellee is "totally disabled from obtaining or maintaining any job in keeping with the standards of a common laborer. . . ." Although he never observed appellee at work or watched a video of the cryovac operator job, he stated that according to the patient's history and Excel's ergonomics manual, appellee would have been made to bend, twist, and exposed to excessive standing, which were risk factors for his injuries. He believed that appellee's injuries were caused by his job. On cross-examination, Scioli admitted based on his understanding of the work at Excel, there is nothing to indicate appellee did anything unusual compared to the ordinary laborer at Excel, and he had no opinion as to whether Excel was negligent.

Excel's own ergonomics manual shows that tendonitis, nerve compression, including carpal tunnel syndrome, and lower back injuries can be CTD disorders. However, there is conflicting testimony among the doctors as to whether appellee's cervical and lumbar injuries were work

related, and whether appellee's initial carpal tunnel problems had resolved so that his subsequent complaints, after not working for some period of time, were related to something else. Nevertheless, it is within the province of the jury to assess the credibility of the witnesses and decide conflicts in the evidence. Even if it could be said that the substance of Scioli's testimony did not sufficiently establish that appellee's injuries were work-related, we believe there was other evidence from which the jury could have inferred that appellee's injuries were work related. *See Gutierrez*, 106 F.3d at 689.

As noted above, in addition to proving that his injuries were the result of his job, appellee must also prove that his workplace injuries were caused by Excel's negligence. The trial exhibits show that in January 1995, OSHA issued a report that cryovac operators are exposed to ergonomic stressors of highly repetitive extended reaches to access bagged meat, and employees must repeatedly exert finger force with the wrist to grasp and drag bags of meat to the cryovac plates. Recommendations were that the feed mechanism should be modified so that reaches can be limited to 16 to 18 inches, the torso is bent no further than six to ten degrees, and an electric eye should be installed to provide employees control over the conveyor movement.

Mark Neill, a former safety director for Excel, testified that he used the number of lost work days in determining the severity of a problem with a particular job. During a two-year period, there were two cryovac machine operators who saw doctors and two who were placed on restricted duty. He averred that Excel could not formally require employees to exchange jobs because the union and employees had a problem with it. All of the work is repetitive because of the nature of it, but in training sessions, they are trying to make employees more aware of what they can do to help themselves. Neill stated that during the first two weeks of employment, an employee goes through exercises to prepare him for the job and during the next 45 days, new employees are in a conditioning program. He further testified that, even without the photo eye, there was a method for the employee to control the speed on the conveyor belt.

Carlos Garza, appellee's supervisor on the line, testified that he did not always have qualified people to perform the job. If there was a shortage of personnel, he had to step in and do the job himself. He stated that if appellee had stepped back to rest his hand for 15 or 20 seconds, the meat would probably start to fall on the floor. Further, if the cryovac operator attempts to slow the conveyor belt, then production on the whole line slows. In 1994, Garza was upset because they were short-handed, but the chain speed stayed the same. When he tried to slow the chain speed, he was "griped at and yelled at." Garza attended an ergonomics training class. On cross-examination, he said that he never made any suggestions about how to make the cryovac position easier.

Ken Demaray, chief union steward for the fabrication floor where appellee worked, testified that he was an ergonomics monitor. If an employee complained to him about excessive work load, he conducted an investigation and analyzed the job. Demaray said that appellee complained to him that the line was too fast when he was analyzing appellee's machine in 1994 or 1995. Demaray also said he was concerned about the repetitions per hour associated with the job. He made a recommendation to the ergonomics steering committee that the speed be slowed. He also made a recommendation that, in order to even out the work load, a photo eye be

installed, but it was not done prior to appellee's injuries. Demaray said that some operators do know how to control the speed of the machine, but are told they will be disciplined if they do so. On cross-examination, Demarary admitted he did not file a grievance with respect to the cryovac operator position because he did not consider it to be an immediate safety threat.

Appellee averred that three or four months before his injury, he told his supervisors and the union that he was having problems with the machine. He stated that there was a speed control but he was not allowed to touch it. He received 24 or more pieces of meat per minute, and he recommended that a photo eye be put on the machine. Appellee said that he never received any ergonomics training. He might have seen the safety book which talks of cumulative trauma disorders, but he never read it. However, on cross-examination, appellee admitted that he was "more or less" familiar with Excel's ergonomics program and that he was encouraged to report injuries upon "first suspicion." He had been seeing the nurse for several weeks prior to April 29, 1995, for soreness.

The safety and ergonomics coordinator for Excel, James Rudd, testified that Excel implemented an ergonomics program in 1989 and 1990. There are production employees who serve as monitors, and a steering committee that is comprised of both labor and management. He stated that there had been plant wide training about prevention of CTD's and there was a medical management program which focused on early intervention and treatment. He admitted that the cryovac operator position poses risks for CTD's, and prior to 1995, Excel installed some height-adjustable work stations. The operator is also able to control the speed of the conveyor belt. When Rudd was an ergonomics monitor, he performed a medical management job analysis form in 1993 on the cryovac operator position. He testified that no recommendations were made to the ergonomics committee or the ergonomics office by employees with respect to installation of a photo eye prior to April 1995. After the suggestion was made, he "went out and took some measurements and discussed the potential for installing the photo eye with the maintenance superintendents." Rudd's conclusion was that, at that time, it would be difficult to install due to technical feasibility. There was an incline to the conveyor belt which made it difficult to put in the table needed for the photo eye. He also concluded, that while the photo eye would make the job more convenient, it was not absolutely necessary after he determined that the history of injury rates on the machine was not significant and several other machines did not have photo eyes.

Rudd was familiar with OSHA's recommendation in January 1995 that a photo eye be installed, but he said that OSHA made numerous recommendations, and Excel worked with OSHA for the next 12 to 18 months to see which of the recommendations could be implemented. The recommendation on the cryovac job was ultimately dropped. He said that the chain speed was not feeding more product to the machine than it could handle and that three times a day, there would be a five to ten minute unofficial break when the product grades are changed from a choice grade to a lower grade when an employee could walk around and stretch. Rudd admitted that 41.6% of the machine operators complained of symptoms of CTD in 1993. However, only two workers either missed work or were placed on light duty, and no back injuries were indicated for cryovac operators. Additionally, the

machine used by appellee handled one of the lighter products.

 While the evidence on cause in fact is not particularly strong, viewing the evidence in the light most favorable to the verdict and disregarding all evidence to the contrary, the jury could have found that the speed of the production line, which workers were discouraged from slowing or stopping, was excessive and the number of repetitions the employee was required to perform because of the speed and without an opportunity to rest was the cause of appellee's CTDs. Additionally, this finding is not so against the overwhelming weight of the evidence as to be manifestly unjust. We also believe that the foreseeability element of proximate cause has been met by the knowledge demonstrated through Excel's own ergonomic program and OSHA's recommendations. We therefore overrule Excel's second issue.

 Excel contends in its third issue that it was entitled to inclusion of the issue of sole proximate cause in the jury charge. Although a non-subscribing employer under the Texas Workers' Compensation Act is not entitled to assert the defense of contributory negligence, if the negligence of the worker was the sole proximate cause of his injuries, recovery is not permitted. *Texas Farm Products Co., v. Stock,* 657 S.W.2d 494, 502 (Tex.App.— Tyler 1983, writ ref. n.r.e.); *Great Atlantic & Pacific Tea Co. v. Najera,* 203 S.W.2d 577, 580 (Tex.Civ.App.—Dallas 1947), *rev.'d on other grounds,* 146 Tex. 367, 207 S.W.2d 365 (Tex.1948). A court is required to submit to the jury questions, instructions, and definitions raised by the pleadings and evidence. *Hyundai Motor Co. v. Rodriguez,* 995 S.W.2d 661, 663 (Tex.1999). If there is some probative evidence to support the instruction, the court is obligated to submit it. *Cash America Intern., Inc. v. Hampton Place, Inc.,* 955

S.W.2d 459, 462 (Tex.App.—Forth Worth 1997, pet. denied); *Roy v. Howard–Glendale Funeral Home,* 820 S.W.2d 844, 845 (Tex.App.—Houston [1st Dist.] 1991, writ denied). However, if a court's charge fairly and fully presents all controlling questions, it is not error to refuse to submit additional instructions which are mere shades or variations of the questions submitted. *Carr v. Weiss,* 984 S.W.2d 753, 766 (Tex.App.—Amarillo 1999, pet. denied).

 Excel raised the defense of sole proximate cause in its second amended answer and contends that the evidence supports the defense because the testimony of Garland and Ringel established that appellee's injuries were not related to his work at Excel. While we agree that the referenced testimony is some evidence that any negligence of Excel did not cause appellee's injuries, we see nothing in the record to show that those injuries were caused solely by appellee's own negligence. Neither doctor offered a specific explanation for the cause of the injuries. While there was some speculation that one or more of the injuries may have been caused by congenital problems or merely by the wear and tear of everyday life, these possible circumstances are not evidence of appellee's negligence. Furthermore, the question submitted to the jury as to whether the negligence of Excel proximately caused any injury in question contained an instruction that the jury was to consider only injuries which occurred in the course and scope of appellee's employment. Thus, we find no reversible error in the trial court's refusal to submit a sole proximate cause issue to the jury. Excel's third issue is overruled.

 In its fourth issue, Excel similarly argues that the trial court erred in not including an instruction on "new and inde-

pendent cause" in the jury charge. Excel argues the same evidence raised in support of its third issue supports the submission of this instruction to the jury. We disagree. The speculation noted above by the doctors as to possible causes of appellee's injuries is not evidence that the act or omission of a separate and independent agency which was not reasonably foreseeable destroyed the causal connection between appellee's injuries and the workplace. Excel's fourth issue is overruled.

■ By way of its fifth issue, Excel contends that separate negligence questions should have been presented to the jury with respect to each injury suffered by appellee. Excel argues that "separate questions may be used to further the policy of judicial economy if the case presents a situation where liability cannot be determined from an answer to a broad form submission."

■ Rule of Civil Procedure 277 requires the court to submit the cause upon broad-form questions whenever feasible. This rule mandates broad form submissions in every instance where it is capable of being accomplished. *Texas Dept. of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990); *Missouri Pacific R. Co. v. Lemon*, 861 S.W.2d 501, 508–09 (Tex. App.—Houston [14th Dist.] 1993, writ dism'd by agr.). The question submitted to the jury was: "[d]id the negligence, if any, of Excel proximately cause any injury in question?" This was, in fact, the controlling question. The jury was also asked: "What sum of money, if paid now in cash, would fairly and reasonably compensate Jimmy Apodaca for his damages, if any, resulting from the negligence of Excel Corporation?" Thus, the jury was only to award damages for injuries that they found were caused by the negligence of Excel.

Excel cites to *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378 (Tex.2000), for the proposition that Rule 277 is not absolute and should only be used whenever feasible. *Id.* at 390. However, in that case a single liability question was submitted to the jury on 13 different theories of liability, four of which were invalid. *Id.* at 389. The court discussed that broad-form submission may not be feasible when there are alternative liability standards and the governing law is unsettled or when the trial court is unsure whether it should submit a particular theory of liability. *Id.* at 390. Neither of those situations exist in this instance.

Excel argues that the damage issues submitted to the jury were global and did not specify the damages that were being awarded for any specific injury. However, the jury was asked to award damages only for the injuries they found were caused by Excel. There is nothing to indicate that the wording of this question resulted in confusion for the jury. Although there were exhibits admitted as to individual medical bills, the testimony before the jury was that total medical expenses incurred by appellee were $72,974, out of which Excel had paid approximately $8,000. The jury awarded $65,000 for past medical care. There was also testimony that appellee might need future back surgery, at a cost of $30,000 to $50,000, with additional expenses for such items as physical therapy and medication. The jury awarded $50,000 in future medical care. The jury's answers would indicate that they certainly found appellee's back injury to have been caused by Excel, as well as his neck and hand injuries. Our standard of review is abuse of discretion, which we do not believe occurred. *See Texas Dept. of Human Services*, 802 S.W.2d at 649. Excel's fifth issue is overruled.

■ In its sixth issue, Excel finds further error in the court's charge by inclu-

sion of a paragraph which it claims was a comment on the effect of the jury's answers to the charge. By instructing the jury not to answer Question Two unless it answered "yes" to Question One, the court "clearly instructed the jury how to answer Question One in order for Apodaca to prevail in this case and was therefore improper." Question One inquired as to negligence and Question Two inquired as to damages.

To support this argument, Excel relies on dissenting opinions in *H.E. Butt Grocery Co. v. Bilotto*, 985 S.W.2d 22 (Tex. 1998). It is not necessary for us to discuss those dissenting opinions. *Bilotto* clearly stands for the proposition that the instruction in question was proper because it is specifically allowed by Rule of Civil Procedure 277, which permits the court to "predicate the damage question or questions upon affirmative findings of liability." *Id.* at 23–24. Moreover, that rule also provides that "the court's charge shall not be objectionable on the ground that it incidentally constitutes a comment on the weight of the evidence or advises the jury of the effect of their answers when it is properly a part of an instruction or definition." Tex.R.Civ.P. 277. In *Bilotto*, the court held that such an instruction only incidentally informs the jury of the legal effect of its answers, 985 S.W.2d at 24, and we have previously agreed with that principle. *See Borden, Inc. v. Price*, 939 S.W.2d 247, 254 (Tex.App.—Amarillo 1997, writ denied). Excel's sixth issue is overruled.

■■■ In its last issue, Excel alleges that it was improper for the trial court to award approximately 3 ½ years of prejudgment interest because appellee delayed the action for approximately one year by initially filing this lawsuit in the U.S. District Court for the Southern District of Texas, which was not a site of proper venue.

Excel contends that prejudgment interest should accrue only since July 25, 1997, the date appellee filed this action in Lubbock County.

The record shows that this action was originally filed on June 25, 1996, as part of a class action in federal court. On September 30, 1996, the court entered an order granting Excel's motion for change of venue for convenience of witnesses and in the interests of justice and transferred the action to the Lubbock division of the U.S. District Court for the Northern District of Texas. On October 8, 1996, the Lubbock federal court transferred the action to the Amarillo federal court. The record also reflects an order of dismissal without prejudice by the Amarillo federal court in May 1997. The record does not reveal exactly when this action was first filed in Lubbock County.

■■■ A court may order that prejudgment interest does not accrue during periods of delay in the trial. Tex.Fin.Code Ann. § 304.108(a) (Vernon Supp.2001). Award of prejudgment interest during such periods of delay is discretionary with the trial court. *Southwest Airlines Co. v. Jaeger*, 867 S.W.2d 824, 837 (Tex.App.—El Paso 1993, writ denied). There is no finding in the record that the filing of this lawsuit in federal court in Brownsville was without merit. However, Excel argues, in reliance on the holding in *Excel Corp. v. Porras*, 14 S.W.3d 307 (Tex.App.—Corpus Christi 2000, pet. denied) that the manager of a grain elevator did not have the broad discretionary powers required to make him a representative of Cargill for venue purposes, the original filing of this lawsuit was without merit. *Id.* at 313. Initially, we note that the decision in *Porras* was issued on October 21, 1999, while the current lawsuit was tried in August 1999. Therefore, there is no basis for the argument that the decision in *Porras* should have put

appellee on any sort of notice. Further, the court's order indicates that the venue change was for the convenience of the parties. We cannot say, based upon this record, that the trial court abused its discretion in awarding prejudgment interest prior to July 25, 1997. Excel's seventh issue is overruled.

In summary, all of Excel's issues are overruled and the judgment of the trial court must be, and hereby is, affirmed.

JOHNSON, Justice, dissenting.

I disagree with the majority's view that the evidence of causation, is legally sufficient to support the jury's finding that appellee's injuries were proximately caused by the negligence of appellant. Therefore, I respectfully dissent.

As noted by the majority, a plaintiff in the posture of appellee must plead and prove that the defendant's negligence [1] proximately caused the injury in order to recover. *Leitch v. Hornsby*, 935 S.W.2d 114, 118 (Tex.1996). Proximate cause consists of cause in fact and foreseeability. *Id.* Cause in fact means that the alleged negligent act or omission was a substantial factor in bringing about the injury and without which the injury would not have occurred. *El Chico Corp. v. Poole*, 732 S.W.2d 306, 313 (Tex.1987). Cause in fact may not be established by mere guess or conjecture; it must be proven by competent evidence. *Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 463 (Tex. 1992).

Appellee worked 17 years for appellant doing physically demanding work. His job required a great deal of lifting and carrying until approximately 1992, when under provisions of a union contract, he bid for the job and became operator of a cryovac machine. His job at the cryovac machine did not require such heavy lifting and carrying as he had previously done, but it required him to constantly bend, reach to grasp bags of processed beef product, and adjust and position the bags on the cryovac machine.

Appellee worked as a cryovac operator from 1992 until April 29, 1995. For approximately two weeks before April 29th, he received treatments from the plant nurse because of discomfort in his hand and wrist. On April 29th, according to appellee, he reached the point that he was physically unable to do the work required by the cryovac machine position because of pain and limitations to his left hand, left wrist, and his neck. After April 29th, he worked about a week in a different job on light duty, using one hand. He then began experiencing pain in his leg which caused him to stop working altogether. Dr. Mark Scioli, who performed surgery on appellee, testified that appellee sustained cumulative trauma disorder (CTD) injuries to his hand, neck and low back which were caused by the repetitive movements and physical stresses of his work activities. Dr. Scioli did not, however, testify that appellee's injuries would have been avoided if the cryovac job activities had been reduced or the workplace design had been altered before appellee was injured so as to correct the activities and designs on which appellee based his negligence claim.

Appellee did not plead or undertake to prove that the cryovac machine job in its entirety was unsafe and that appellant was negligent in simply having a cryovac operator position at all. There was no attempt to show that all repetitive bending, reaching, grasping, pulling and lifting movements would have been removed from the cryovac operator's job if appellant had

---

**1.** I assume the evidence is legally and factually sufficient to support a finding that appellant was negligent, and thus only address the issue of causation.

been acting with ordinary care. And, as shown by appellee's proof, a CTD injury is the end result of repetitive physical movements and stresses which individually are not so great as to cause an injury, but, rather, which eventually cumulate to "wear out" a part of the injured person's body and thereby cause what is referred to as a CTD injury.

Appellee's allegations of negligence and proof were, in substance, that appellant was negligent and provided an unsafe place to work because the machinery and design of the cryovac operator's workplace required *excessive* bending, reaching, pulling and body movements, without appropriate rest periods, and also because appellant did not timely detect and cause treatment of appellee's CTD symptoms. Appellee alleged that the cryovac operator's job as it was prior to and in April, 1995, required appellee to bend his body *too far*, reach *too far* for the bags of product, process *too many* bags of product (*i.e.,* the product processing line was set at a chain speed which was excessive) and work for excessive periods without rest breaks. He also alleged that the machine did not have a photo-electric eye to automatically stop the processing conveyor line when appellee fell behind in moving bags of product, and appellant failed to do "symptom surveys" to detect early signs of CTD in appellee so the effects of the cumulative trauma could have been treated earlier.

Jury question number one inquired "Did the negligence, if any, of Excel proximately cause any injury in question?"[2] The trial court instructed the jury that

"Proximate Cause" means that cause which, in a natural and continuous sequence, produces an event, *and without*

*which such cause such event would not have occurred.* In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or some similar event, might reasonably result therefrom. (Emphasis added)

Neither party objected to the instruction. The jury answered "yes."

Appellant urges that the jury's answer to the question was based on legally insufficient evidence because there was no evidence that if either the cryovac machine worksite or job requirements had been modified or the number of cattle processed per hour had been reduced, or if all three had occurred, then appellee would not have suffered CTD injuries. *See Leitch,* 935 S.W.2d at 119. Appellant advances the same legal insufficiency argument as to its alleged negligence in failing to inquire about and detect appellee's CTD symptoms earlier than appellee's reporting of them. *See id.* Thus, appellant reasons, appellee has not proved that the alleged *negligence* of appellant was a cause in fact of appellee's CTD injuries. In other words, appellee did not prove that but for the alleged negligence of appellant, appellee's CTD injuries would not have occurred. *See id.; Mosley v. Excel Corp.,* 109 F.3d 1006, 1009 (5th Cir.1997).

As part of his proof, appellee introduced evidence about injury rates to cryovac operators; recommendations for changing the cryovac worksite, job activities and machinery configurations; and recommendations that CTD symptom surveys be performed. The recommended changes assertedly would have reduced the injury rate for cryovac machine operators. The

---

**2.** Appellant's fifth issue urges error in the broad form submission because of the three different parts of his body appellee claimed

were injured. *See Crown Life Ins. Co. v. Casteel,* 22 S.W.3d 378, 388–90 (Tex.2000).

evidence was not to the effect that CTD injuries would have been eliminated by the recommended changes.

Appellee's evidence, however, did not address the "but for" aspect of appellee's injuries having been proximately caused by appellant's alleged negligence. For example, witnesses testified that the processing lines, including the cryovac machine operated by appellant, were set to process a certain number of cattle per hour. Appellee testified that when he first began working at the cryovac machine in 1992, the processing rate was a little over 200 cattle per hour. The processing rate gradually increased. In April, 1995, when he last worked on the cryovac machine, he recalled that the processing rate was 240–250 per hour. Sometime after appellee quit working in 1995, the processing rate increased to 272 cattle per hour. Yet, no witness or evidence was presented to prove that if the processing rate had remained at 200 cattle per hour, or had been decreased instead of increased, appellee's CTD injuries would not have occurred. Nor was evidence offered to prove that if the workplace had been modified before appellee was injured so that the angle he was required to bend, or the distance he was required to reach was reduced, then appellee would not have been injured. No proof was offered that use of an electric eye control on the product line would have prevented appellee's back, shoulder, neck, wrist, or hand injuries. The proof was that installation of an electric eye control was considered and that recommendations (including a recommendation by OSHA) were made that such a control be installed. The changes purportedly would have, in general, reduced the number of injuries. Whether such changes would have prevented appellee's particular CTD injuries was not addressed by the evidence.

Nor was evidence offered that appellee's injuries would have been prevented had appellee received earlier treatment for his CTD symptoms. Moreover, evidence concerning early intervention by medical or other management when CTD symptoms occurred[3] addressed the relieving, minimizing or curing of injuries following manifestation of the CTD's, not prevention of the injury initially by removing the trauma which cumulated to cause the injury.

In sum, appellee did not prove that he would not have suffered his CTD injuries but for the alleged negligence of appellant. *See El Chico Corp.*, 732 S.W.2d at 313. Whether his 17 years of physically demanding labor and repetitious activities required by the cryovac operator's job which were not alleged to have been negligence on the part of appellant would have resulted in the CTD injuries to appellee even in the absence of the allegedly negligent acts and omissions of appellant was left to the speculation of the jury. In such instance, the proof of cause in fact is insufficient. *Havner*, 825 S.W.2d at 463. I would sustain appellant's second issue challenging the legal sufficiency of the evidence to support the jury finding that appellee's injuries were proximately caused by the negligence of appellant.

---

**3.** The competency of such evidence was not challenged. *See Leitch*, 935 S.W.2d at 119.