**EXCEL CORPORATION, Petitioner,**

v.

**Jimmy APODACA, Respondent.**

No. 01–0358.

Supreme Court of Texas.

Argued March 27, 2002.

Decided June 27, 2002.

Rehearing Denied Aug. 29, 2002.

Robert L. Craig, Jr., Craig Terrill & Hale, Leslie F. Hatch, Murchison Hund Harriger L.L.P., Lubbock, Robert M. Cohan, Linda S. Althoff, Ella Schroeder Namaksy, William David Ellerman, Jackson Walker L.L.P., Dallas, for Petitioner.

Kevin Glasheen, Christopher T. Carver, Jeffrey H. Cluff, Fadduol Glasheen & Valles, Lubbock, for Respondent.

Justice HANKINSON delivered the opinion of the Court.

Jimmy Apodaca suffered from cumulative trauma disorders (CTDs) while working at Excel Corporation's beefpacking plant in Friona, Texas. He sued Excel, a nonsubscriber under the Texas Workers'

Compensation Act, for negligence and gross negligence in failing to provide a safe workplace. The trial court rendered judgment on the jury's negligence verdict for Apodaca, and the court of appeals affirmed. 51 S.W.3d 686. In this cause, Excel challenges, among other things, whether legally sufficient evidence exists to support the jury's finding that Excel's negligence proximately caused Apodaca's injuries. We conclude that no evidence supports that finding, and accordingly reverse the court of appeals' judgment and render judgment that Apodaca take nothing.

Apodaca began working at Excel in 1978. He held a number of physically demanding positions before sustaining injuries to his neck, back, and wrist that ultimately resulted in his being unable to return to work in 1995. During his last three years at Excel, Apodaca worked as a cryovac 8300 operator. As a cryovac 8300 operator, Apodaca handled bags of meat weighing up to forty pounds, which were moved by a conveyor belt to a table located near him. As bags landed on the table, Apodaca would bend to grab a bag, turn towards the cryovac machine, and slide the bag onto a machine plate. The cryovac machine then removed air from the bag and sealed it. During a typical eight-hour shift, Apodaca sealed one bag approximately every three seconds.

On May 2, 1995, Apodaca completed an Employee Statement of Injury, reporting pain in his left hand. He visited several physicians for treatment. While Apodaca's doctors determined he had injured his back, neck, and wrist, the only injury they agreed was work related was the carpal tunnel syndrome in his wrist. Accordingly, Excel paid for medical expenses related to the carpal tunnel injury. An orthopedic surgeon treated the carpal tunnel injury by splinting Apodaca's hand. On August

3, 1995, an electromyography revealed that the carpal tunnel syndrome had resolved. At this point, Excel stopped paying Apodaca's medical expenses. Nonetheless, Apodaca eventually underwent three operations to treat his neck, lower back, and wrist. Despite feeling better after these surgeries, Apodaca continued to suffer pain and could no longer work or perform household duties, such as mowing the lawn or washing dishes.

Because Excel is a nonsubscriber under the Workers' Compensation Act, Apodaca sued Excel alleging common-law claims of negligence and gross negligence in failing to provide a safe workplace. *See* TEX. LAB.CODE § 406.033(d); *Werner v. Colwell,* 909 S.W.2d 866, 868 (Tex.1995). Apodaca specifically alleged that the machinery and design of the cryovac operator's workplace required excessive bending, reaching, and pulling, without appropriate rest periods, and that Excel's untimely detection of his CTD symptoms aggravated his injuries and delayed treatment for them. The jury found Excel negligent and awarded actual damages of $536,472. The trial court rendered judgment on the verdict.

The court of appeals rejected Excel's challenges to the qualification of a juror, the legal and factual sufficiency of the evidence supporting the jury's proximate-cause finding, the jury charge, and the prejudgment-interest award. 51 S.W.3d 686. With respect to the evidence of proximate cause, the court concluded, among other things, that "the evidence on cause in fact is not particularly strong," but that "the jury could have found that the speed of the production line, which workers were discouraged from slowing or stopping, was excessive and the number of repetitions the employee was required to perform because of the speed and without an opportunity to rest was the cause of [Apodaca's] CTDs." *Id.* at 699. One justice dissented,

however, concluding that "[Apodaca] did not prove that he would not have suffered his CTD injuries but for the alleged negligence of [Excel]." *Id.* at 704. A divided court of appeals therefore affirmed the trial court's judgment. *Id.* at 702.

On petition for review, Excel challenges, among other things, the legal sufficiency of the evidence to support the jury's finding that Excel's negligence proximately caused Apodaca's injuries. Proximate cause comprises two elements: cause in fact and foreseeability. *Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 477 (Tex.1995). Foreseeability means that a person of ordinary intelligence would have anticipated the danger his or her negligence creates. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 313 (Tex.1987). The test for cause in fact, or "but for cause," is whether the act or omission was a substantial factor in causing the injury "without which the harm would not have occurred." *Boys Clubs,* 907 S.W.2d at 477. A finding of cause in fact cannot be supported by "mere conjecture, guess, or speculation," *id.,* but may be based on either direct or circumstantial evidence. *Havner v. E–Z Mart Stores, Inc.,* 825 S.W.2d 456, 459 (Tex.1992).

Specifically, Excel argues that Apodaca presented no evidence of cause in fact—that at best, Apodaca offered evidence that he suffered work-related injuries, but presented no proof that if Excel had done something different at the worksite, Apodaca would not have been injured or would not have been injured as severely. In determining whether Apodaca presented legally sufficient evidence to meet that test, we view the evidence in a light that tends to support the finding of the disputed facts and disregard all evidence and inferences to the contrary. *See Bradford v. Vento,* 48 S.W.3d 749, 754 (Tex. 2001).

Apodaca presented several different categories of evidence to show that his injuries were caused or exacerbated by Excel's failure to provide a safe workplace, including: (1) testimony from Excel employees about recommended or requested changes to the cryovac worksite and about recommended ergonomics and medical-management programs; (2) Occupational Safety and Health Administration (OSHA) recommendations about changes to the cryovac worksite and the use of symptoms surveys; and (3) medical testimony linking Apodaca's injuries to his job. Before this Court, although he mentions other evidence, Apodaca highlights the testimony of James Rudd, a safety and ergonomics coordinator at Excel: "Mr. Rudd's testimony, standing alone, is certainly sufficient for purposes of a 'no evidence' challenge to support the jury's finding that but for Excel's negligence, [Apodaca] would not have suffered his injuries." Accordingly, we begin by reviewing Rudd's testimony in detail.

Rudd worked for Excel for eleven years, first on the production line and then later as an ergonomic and safety monitor and coordinator. Among his job responsibilities was to set up training programs about CTDs for Excel employees. He testified that he trained employees to understand their role in Excel's ergonomics program, recognize potential contributors to and risk factors for CTDs, learn ways to control risk factors, and encourage early reporting and treatment of CTDs. Rudd testified that in his experience, Excel employees were exposed to the risks that contribute to CTDs, and that cryovac operators specifically were exposed to such risks.

Identifying CTD symptoms early was especially important for purposes of intervention. Excel's training manual, *The Ergonomics Manual,* also emphasized early identification, stating that a primary ergonomic goal was to treat health problems

early and avoid surgery or more other complex medical treatments. To meet this goal, Excel's manual *Introduction to Ergonomics* recommended adoption of a medical-management program to screen employees for early stages of disorders and employ conservative treatment. *The Ergonomics Manual* suggested that medical-management programs use formal questionnaires and surveys to gather information about employees who suffered from CTD symptoms. From 1991 through 1997, Excel performed these medical-management surveys annually. Early identification of CTD symptoms is critical, Rudd explained, because all CTDs are completely reversible if treated early with conservative treatment.

OSHA recommended annual use of a symptoms-survey checklist in its manual, *Ergonomic Program Management Guidelines for Meatpacking Plants*. Rudd agreed that annual surveys are beneficial. Conducted anonymously to encourage employee participation, these surveys aid in identifying the areas of a worksite or the jobs where potential CTD problems exist. A major strength of the survey approach is the ability to collect data on the number of workers who may be experiencing some form of CTD. Excel used symptoms surveys in 1991, but did not do so in 1992, 1993, and 1994. It reintroduced the surveys in 1995, after Apodaca sustained his injuries.

OSHA further recommended and Excel employees had requested that Excel install a photo eye on the cryovac machine, which it did not do. There was testimony that a photo eye would have better regulated the flow of production by detecting bags of meat on the conveyor belt and stopping and starting accordingly. Excel also did not implement OSHA recommendations that cryovac operators reach no more than sixteen to eighteen inches and bend no further than six to ten degrees in order to reduce deviated postures and extended reaches, which contribute to CTDs. Apodaca and other Excel employees, including a former safety director, chief union steward for Apodaca's floor, and Apodaca's supervisor, testified to the difficulties and risks presented by the cryovac operator environment and job requirements. Apodaca also presented testimony from three treating physicians, who agreed that at least his wrist problems were work related.

From this evidence, Apodaca argues that had Excel followed recommendations to modify the cryovac work environment and had it conducted symptoms surveys, he would not have been injured, his injuries would not have been as severe, or his injuries would have been detected earlier and could have been reversed with conservative treatment instead of developing to the point that surgery was required. But we have reviewed the record in its entirety and can find no evidence that symptoms surveys, conducted anonymously to identify worksite problems, would have identified Apodaca's CTD injuries earlier, thereby allowing CTD reversal through conservative treatment. Nor is there any evidence that modifications to the cryovac work environment would have reduced the number of injuries or the CTD incident rate for Apodaca's job. No evidence in the record indicates that had Apodaca performed fewer repetitions per hour, worked at a more comfortable work station, or had a photo eye on his machine, he would not have sustained his injuries. Furthermore, the fact that the meatpacking industry, or even just the cryovac operator position, had a high injury rate is not probative evidence of whether under different conditions, the cryovac operator job would have a lower injury rate. If anything, much of Apodaca's evidence fulfills only the foreseeability element of proximate cause by demonstrating the

dangerous nature of the cryovac operator position. *See El Chico*, 732 S.W.2d at 313 (explaining that the foreseeability element means that "the actor as a person of ordinary intelligence should have anticipated the dangers his negligent act creates for others").

■ The evidence cited by Apodaca and relied on by the court of appeals all suffers from the same essential defect: while the evidence may show that Excel should have employed other practices and that Apodaca's injuries were work related, none of it shows that had Excel employed those other practices, Apodaca would not have been injured. *See Boys Clubs*, 907 S.W.2d at 477. In other words, the evidence does not show that had Excel modified the cryovac worksite or job requirements, or had it conducted symptoms surveys, Apodaca would not have suffered his injuries or they would have been diagnosed sooner and reversed using other treatments.

The medical evidence suffers from the same infirmity. The doctors agreed that at least part of Apodaca's injuries, specifically his wrist injury, was work related. Two doctors testified that the motions demanded by Apodaca's work environment caused carpal tunnel syndrome to develop in Apodaca's wrist; another stated that he believed all of Apodaca's injuries were caused by his job. But no doctor linked those injuries to anything Excel did or failed to do. While the evidence supports the conclusion that at least some of Apodaca's injuries were work related, it fails to establish that Apodaca would not have been injured but for any negligent conduct by Excel. *See Boys Clubs*, 907 S.W.2d at 477. Thus, we agree with the dissenting justice in the court of appeals that whether Apodaca would have suffered CTD injuries in the absence of Excel's negligent acts or omissions "was left to the speculation of the jury." 51 S.W.3d at 704. We there-

fore conclude that there is no evidence that Excel's negligence was the cause in fact of Apodaca's injuries.

Because Apodaca failed to present legally sufficient evidence that Excel's negligence proximately caused his injuries, we need not consider the other issues raised by Excel. Accordingly, we reverse and render judgment that Apodaca take nothing.